616 A.2d 422

**John JONES a/k/a Anthony Jones**

**v.**

**STATE of Maryland.**

**No. 40, Sept. Term, 1992.**

Court of Appeals of Maryland.

Dec. 11, 1992.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., of Maryland, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

John Jones seeks reversal of his criminal conviction on the ground that he was deprived of his constitutional right to counsel. This is so, he contends, because the lawyer who conducted his defense was then under suspension from the practice of law in Maryland for failure to pay the annual assessment required by law.

## I

Consistent with ch. 779 of the Acts of 1965,[1] the Clients' Security Trust Fund of the Bar of Maryland was created by what is now Maryland Rule 1228. Its purpose, as set forth in paragraph b3 of the Rule, is "to maintain the integrity and protect the good name of the legal profession by reimbursing, to the extent authorized by this Rule and deemed proper and reasonable by the trustees, losses caused by defalcations of members of the Bar of the State of Maryland or out-of-state attorneys authorized to practice in this State." Paragraph f1 of the rule requires that each lawyer admitted to practice law in this State shall "as a condition precedent to the practice of law ... in this State, pay annually to the treasurer of the trust fund the sum ... [which the Court of Appeals] may fix." Paragraph g2(i) provides that a lawyer who is in default of payment of the

---

1. This enactment is now codified as Maryland Code (1989, 1992 Cum.Supp.), §§ 10–310—10–312 of the Business Occupations and Professions Article.

assessment levied by the Fund shall, by order of this Court, be prohibited from further practice of law in the State. The rule further provides in paragraph g2(ii) that an attorney who practices law notwithstanding this Court's order prohibiting such practice may be proceeded against for contempt of this Court.

## II

Jones was tried before a jury in the Circuit Court for Baltimore City for murder in the first and second degrees, felony murder, rape in the first and second degrees, sexual offenses in the first, second, and third degrees, assault with intent to commit sexual offenses, armed robbery, kidnapping, carrying a deadly weapon with intent to injure, and two handgun violations.

The State's principal witness, Bertrina McCants, testified that on the night of November 27–28, 1989, Jones and Gerald Parkey came to the apartment she shared with her companion, Willis Madison. She stated that while in the bedroom, she heard a disturbance from the living room, after which Jones entered the bedroom, ordered her at gunpoint to open a safe, and took money and jewelry. She testified further that Jones and Parkey then abducted her and drove her to two motels on the outskirts of Baltimore City, where they repeatedly raped and otherwise sexually attacked her before she escaped.

The State established that Willis Madison was found stabbed to death on the floor of the apartment. The prosecution's corroborative evidence included Jones's fingerprints found on a wine bottle at the apartment, and his palm and fingerprints found on a window of Parkey's car. The State also presented scientific evidence related to semen stains found on McCants's underpants and on a bed sheet retrieved from one of the motels. Analysis of the semen indicated that it had come from a man with type O blood; Jones's blood tested type O, while the blood of both Parkey and Madison did not. Expert microbiologists fur-

ther testified for the State that DNA comparisons between the semen and Jones's blood indicated a match that, expressed most conservatively in statistical form, would occur in 1 of 2,300 individuals.

Jones offered witnesses whose testimony suggested that he was elsewhere during the events in question. The defense also elicited from McCants that she had not attempted to escape earlier, even though she had several opportunities to do so.

The jury found Jones guilty on one count of committing a sexual offense in the third degree. It acquitted him on the charges of carrying a deadly weapon with intent to injure, committing a sexual offense in the second degree, and assault with intent to commit sexual offenses. The jury being deadlocked on the remaining charges, a mistrial was declared on those counts.

Prior to sentencing, the trial court (Prevas, J.) learned that Jones's lawyer, Gerald Shipley, was in default of payment of his assessment to the Fund and had, by order of this Court dated June 6, 1988, been "prohibited from the further practice of law in the State of Maryland." The court found that Shipley had no actual knowledge of this prohibition at the time of trial. It raised, *sua sponte*, the question of whether Shipley's failure to pay the assessment, with its resulting prohibition from further law practice, denied Jones his right to counsel under the Sixth and Fourteenth Amendments, thereby rendering the verdict null and void. Judge Prevas concluded that a new trial was not required:

> "[G]ranting a motion to have a new trial because of the fact that Mr. Shipley was technically not licensed at that particular moment would neither protect the integrity of the judicial system nor vindicate the interests of a party victimized by the unlicensed practice of law.

> "I don't find that Mr. Jones was victimized at all. I think he had the counsel of his choice and employed the

strategy of his choice, and he got a result much better than he could have hoped for.

. . . .

"There was no defect in the sense of the proceedings. Mr. Shipley didn't do anything as a suspended lawyer that he wouldn't have done as a lawyer in practice.

"So there is nothing the defendant has to complain of in terms of how the trial was conducted; but, secondly, there was no prejudice. Again, Mr. Shipley did everything that could be expected."

The circuit court sentenced Jones to ten years in prison. He filed a timely appeal to the Court of Special Appeals. On our own motion, we issued a writ of certiorari prior to consideration of the appeal by the intermediate appellate court to decide the novel question presented by the case.

### III

■ Jones urges us to adopt a per se rule declaring that a criminal defense conducted by a suspended lawyer violates the constitutional guarantee to counsel. He insists that, for constitutional purposes, he was deprived of counsel altogether during his trial. He argues that this Court's order of June 6, 1988, had caused Shipley's name to be stricken from the list of members of the Bar in good standing and, in effect, had rendered him a non-lawyer ineligible to practice.[2] Jones thus believes that the issue turns on Shipley's status regarding bar membership.

■ As earlier observed, Rule 1228 provides a mechanism by which lawyers annually contribute a sum, not to

---

**2.** Jones invites our attention to, and relies upon Maryland Rule BV13(a)(2), which reads in pertinent part: "The attorney may not practice law after entry of an order disbarring the attorney, placing the attorney on inactive status, or accepting the attorney's resignation or during the period the attorney, by order, is suspended. Upon expiration of the period of suspension specified in the order, the Clerk of the Court of Appeals shall replace the name of the attorney upon the register of attorneys in that Court, and the attorney may practice law."

exceed $20, to a Fund used to satisfy certain losses incurred by clients of Maryland attorneys. *See Monumental Life Ins. Co. v. Trustees,* 322 Md. 442, 444, 588 A.2d 340 (1991). The Trust Fund thus functions as a protection for clients of unscrupulous lawyers who misappropriate money. Rule 1228 further sets forth the procedural steps leading to decertification of an attorney for nonpayment of the annual contribution. It also provides in paragraph g3 that a lawyer prohibited from practicing law for failure to pay the assessment may, upon payment of the arrearage, remove the default and have this Court rescind its order precluding the lawyer from further practice in Maryland.[3]

As we see it, Shipley's default in payment of the requisite assessment and resulting decertification differs from a disciplinary suspension or disbarment; it has no connection with the lawyer's character, intellectual acuity, or dedication to the client's interests. His lapse may have been, as he claims, a mere oversight, not unlike an inadvertent accounting error. By contrast, the Sixth Amendment to the Constitution implicates the far weightier concept of effective representation by counsel at a criminal trial. The United States Court of Appeals for the Seventh Circuit so recognized in addressing a recent case much like that now before us. In *Reese v. Peters,* 926 F.2d 668 (7th Cir.1991), the appellant in a habeas corpus proceeding sought to vitiate his criminal conviction on the ground that the state had suspended his trial lawyer's license because the lawyer had not paid the mandatory Bar assessment required by law. In rejecting Reese's claim that he had been denied his right to counsel, the court succinctly reduced the issue in dispute to its essence: "The *constitutional* question is whether the court has satisfied itself of the advocate's competence and authorized him to practice law.... [S]uspensions used to wring money from lawyers' pockets do not stem from any doubt about their ability to furnish zealous

---

**3.** Shipley later paid the required assessment and by order dated October 10, 1990, we rescinded our earlier order of June 6, 1988.

and effective assistance." *Id.* at 670 (emphasis in original). The court concluded that the suspended attorney still qualified as counsel for Sixth Amendment purposes within the constitutional meaning of the word. *Id. See also Solina v. United States,* 709 F.2d 160, 167, n. 9 (2d Cir.1983) (in which the court, in construing the original understanding of the term "counsel" for Sixth Amendment purposes, indicated that a technical defect in the licensed status of a defendant's lawyer did not violate the defendant's constitutional right to counsel); *United States v. Mouzin,* 785 F.2d 682, 694–98 (9th Cir.1986).

State appellate courts faced with similar questions act virtually unanimously in declining to find a Sixth Amendment violation when a lawyer has been suspended for not paying bar dues or fees. Asserting that the lawyer's original admission to the bar allowed it to assume that he possessed the training, knowledge, and ability to represent effectively the client who had chosen him, the Supreme Court of Illinois upheld a conviction obtained after the lawyer's name had been removed from the master roll of attorneys for failure to pay his annual registration dues. *People v. Brigham,* 151 Ill.2d 58, 175 Ill.Dec. 720, 600 N.E.2d 1178 (1992). Similarly, in affirming the conviction of a defendant represented by a lawyer suspended for nonpayment of the annual attorney registration fee, the Supreme Court of Kansas explained:

"There is no doubt that Johnson's appointed counsel, Wilson, was not entitled to exercise the privilege of practicing law after receiving notice of his suspension for the nonpayment of registration fees. The suspension ... had the effect of prohibiting Wilson from practicing law until the annual fees were paid. In spite of his suspension, we cannot say as a matter of law that Wilson was unable to represent effectively the petitioner Johnson during the period of his suspension. Although the payment of the registration fee is a prerequisite to the ethical practice of law in this state, the payment itself has nothing to do with the legal ability of the attorney. Just

as the payment of the fee does not guarantee that an attorney will practice law in a competent manner, the nonpayment of the fee does not necessarily imply that the nonpaying attorney will perform in an incompetent manner. In each instance, we must examine the actual representation afforded the accused person."

*Johnson v. State,* 225 Kan. 458, 590 P.2d 1082, 1087 (1979); *See also People v. Medler,* 177 Cal.App.3d 927, 223 Cal. Rptr. 401 (1986); *Dolan v. State,* 469 So.2d 142 (Fla.App.3 Dist.1985); *Jones v. State,* 747 S.W.2d 651 (Mo.App.1988); *Hill v. State,* 393 S.W.2d 901 (Tex.Crim.App.1965).

Consonant with the decisions considered above, we do not equate arrearages in Shipley's required Trust Fund payments, which in turn prompted his prohibition from the practice of law, with inadequate legal representation at a criminal trial. In other words, Shipley's default on his obligation to pay the required assessment bore no meaningful relation to his ability to defend Jones against charges of murder, rape, armed robbery, and kidnapping.

The few cases relied upon by Jones are easily distinguished from his own. They involve either imposters, *i.e.,* laymen masquerading as attorneys, or representatives who had never been admitted to the bar at all. *See, e.g., People v. Felder,* 47 N.Y.2d 287, 418 N.Y.S.2d 295, 391 N.E.2d 1274 (1979); *Bennie v. Triangle Ranch Co.,* 73 Colo. 586, 216 P. 718 (1923); *Leonard v. Walsh,* 73 Ill.App.2d 45, 220 N.E.2d 57 (1966); *People v. Williams,* 140 Misc.2d 136, 530 N.Y.S.2d 472 (Sup.Ct.1988). The risks to individual clients and to the integrity of the legal system inherent in representation by a person who has never qualified to practice law are not present in the instant case. Shipley had attended law school, obtained his degree, and passed a bar examination. He was duly admitted to practice in Maryland. His moral character is not at issue, and he was not suspended or disbarred for disciplinary infractions. In the circumstances of this case, Shipley's temporary decertification for failure to pay the Trust Fund assessment does not, without more, render him incapable of providing the assistance of

counsel demanded by the Constitution.  Indeed, Shipley's reinstatement to the Bar was automatic upon mere payment of the requisite sum to the Fund.

■ The reasons for loss of licensure can be so varied both in kind and in degree that imposition of a per se rule is inappropriate.  *State v. Smith,* 476 N.W.2d 511, 513 (Minn. 1991).  Beyond that, we note that Jones has not claimed that Shipley's conduct of the defense did not fully comport with the standard of a reasonably competent criminal defense attorney as required by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

JUDGMENT AFFIRMED, WITH COSTS.