588 A.2d 340

**MONUMENTAL LIFE INSURANCE COMPANY**

v.

**The TRUSTEES OF the CLIENTS' SECURITY TRUST FUND OF the BAR OF MARYLAND.**

Misc. No. 21, Sept. Term, 1990.

Court of Appeals of Maryland.

April 8, 1991.

James O'C. Gentry, Baltimore, for appellant.

Willie J. Mahone, Frederick, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ.

McAULIFFE, Judge.

The Clients' Security Trust Fund of the Bar of Maryland (the Fund) was created in 1966 by rule of this Court, consistent with the earlier enactment by the General Assembly of Chapter 779 of the Acts of 1965. The principal purpose of the Fund is to reimburse, to the extent reasonable and possible, losses caused by defalcations of Maryland lawyers who are acting either as attorneys or as fiduciaries. Monumental Life Insurance Company (Monumental) filed a claim against the Fund, claiming reimbursement for $24,000 it lost because of a fraud practiced upon it by a Maryland attorney. The trustees of the Fund denied Monumental's claim on three grounds: 1) Monumental was neither the client of, nor in a fiduciary relationship with, the attorney; 2) contributory negligence; and 3) assumption of the risk. Monumental invoked review by this Court by the timely filing of exceptions. We affirm the decision of the trustees, finding it necessary to consider only the first ground of disallowance of the claim.

Monumental's loss of $24,000 in 1986 was caused by Michael B. Mitchell, who was then a member of the Maryland Bar.[1] Mitchell represented Sarah Elizabeth Catus, maternal grandmother of Lance Aaron Bethea, a minor. Lance's mother, Shala Monique Catus, died on 18 October 1986. Mitchell represented Shala's mother in connection with the administration of Shala's estate and with respect to a claim against Monumental for life insurance benefits payable to Lance upon Shala's death.

On 11 December 1986, Mitchell filed his client's claim for the life insurance benefits with Monumental. He attached to the claim a copy of letters of administration issued by the Register of Wills for Baltimore City, appointing his client as personal representative of her daughter's estate. He also enclosed what purported to be an attested true copy of an order of the Circuit Court for Baltimore City, appointing

---

1. Mitchell was disbarred by this Court on 17 May 1988.

Mitchell's client guardian of the property of Lance, and specifically authorizing her to collect from Monumental the proceeds of the life insurance policy.

Lance was the named beneficiary of his mother's insurance policy. Monumental, acting on the strength of the claim filed by Mitchell and the order of court represented by Mitchell to be genuine, paid $24,000 by check made payable to "Sarah E. Catus, Guardian of Lance Aaron Bethea, Minor" and sent the check to Mitchell. The check was endorsed by Ms. Catus,[2] and deposited in the clients' fund account of Mitchell's law firm. The entire proceeds were ultimately converted by Mitchell to his own use.

The "court order" Mitchell sent to Monumental was a forgery. Although Mitchell's law firm had filed a petition for guardianship on behalf of Ms. Catus in November, 1986, no order appointing her guardian was ever signed by a judge of the Circuit Court for Baltimore City. Mitchell later admitted to having prepared and forwarded the counterfeit order.[3]

Barry L. Bethea, father of Lance Bethea, filed a claim with Monumental. Mr. Bethea notified Monumental that Lance lived with him and that, as the true natural guardian of the child, he was entitled to receive the proceeds of the policy on the child's behalf. Monumental denied the claim and the father sued. The Circuit Court for Baltimore County granted summary judgment in favor of the father, and Monumental paid the judgment without appealing.

After being forced to pay twice on its policy, Monumental brought this claim against the Fund. As indicated above, the trustees of the Fund denied the claim for a number of reasons. Monumental filed timely exceptions pursuant to Maryland Rule 1228 j 2, and asks that we reverse.

---

**2.** The record is not clear whether Ms. Catus actually signed the endorsement, or whether the signature was forged.

**3.** Mitchell admitted to forgery, and the subsequent conversion of the insurance proceeds, in a plea agreement reached in connection with subsequent criminal proceedings.

The history and purpose of the Fund was carefully traced by Judge Smith, writing for the Court in *Folly Farms I, Inc. v. Trustees*, 282 Md. 659, 661–63, 676–81, 387 A.2d 248 (1978). The statement of purpose of the Fund is currently codified at Md.Rule 1228 b 3:

> The purpose of the trust fund shall be to maintain the integrity and protect the good name of the legal profession by reimbursing, to the extent authorized by this Rule and deemed proper and reasonable by the trustees, losses caused by defalcations of members of the Bar of the State of Maryland ... acting either as attorneys or as fiduciaries (except to the extent to which they are bonded).

This Rule tracks, in pertinent part, the language of the legislative enactment authorizing the creation of the Fund. See Art. 10, § 43(b), Maryland Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.) and the current codification at §§ 10–311(b) and 10–312(b) of the Business Occupations and Professions Article, Md.Code (1989).

■■■ The principal question generated by these proceedings is whether a claimant must be the client of, or in a fiduciary relationship with, the defaulting attorney. Monumental concedes that no attorney-client relationship existed between it and Mitchell but argues that an attorney-client relationship is immaterial. Rather, the defaulting attorney must act as an attorney, in connection with an existing attorney-client relationship, and the attorney must have caused a loss to the claimant. This interpretation says Monumental, would be consistent with the stated purpose of maintaining the integrity and protecting the good name of the legal profession. The trustees, on the other hand, believe that if the claim is based on the existence of an attorney-client relationship, the relationship must be between the defaulting attorney and the claimant. We hold that the trustees' interpretation is correct.

The creation of the Clients' Security Trust Fund involved a balancing of interests. The lawyers of this State sought to provide, through their own contributions, a Fund to

reimburse, to the extent possible, the rare client who lost funds because of a defalcation by that client's attorney. Recognizing that the money available to the Fund would be limited, the Rule creating the Fund provided that "[n]o claimant or other person or organization has any right in the trust fund as beneficiary or otherwise." Rule 1228 i 2. The Rule also granted to the trustees wide discretion to determine which claims it would honor, in what amounts, and the schedule of payments that would apply. Rule 1228 i 1 & 3.

The discussions within the Maryland State Bar Association preceding the approval of the Clients' Security Trust Fund make it clear that the members understood the Fund would not, and could not, cover all losses an attorney might cause. *See generally* 69 Trans.Md.St.B.A., 209–34, 363–71 (1964); 70 Trans.Md.St.B.A., 9–16 (1965). The members were, however, anxious not only to offer protection against a lawyer's embezzlement of his client's funds, but also to ensure that a person for whom an attorney was acting as a fiduciary would be entitled to claim against the Fund for a loss resulting from defalcation by the attorney, even though an attorney-client relationship did not exist between the claimant and the attorney. 69 Trans., *supra*, at 224–26. This desire was consistent with the observation of the Chairman of the American Bar Association Committee on Clients' Security Fund, that

> the better clients' security fund procedure may be to expand the voluntary coverage of the fund to the client whose lawyer is acting as a fiduciary, since the public is not prone to recognize the refined distinction.

Bryan, *Clients' Security Fund Ten Years Later*, 55 A.B. A.J. 757, 759 (1969). The history of the Fund suggests, then, a carefully tailored and rather narrow expansion of the desire to provide some protection to clients from defalcations by their attorneys, rather than a broad-brush attempt to compensate for any type of loss caused by an attorney.

The consistent use of the word "defalcation" to describe the conduct of an attorney against which protection is being offered is also consistent with the interpretation we adopt today. *Webster's Third New International Dictionary* 590 (1963) defines defalcation as "misappropriation of money in one's keeping." *Black's Law Dictionary* 375 (5th ed. 1979) defines the term as "misappropriation of trust funds or money held in any fiduciary capacity; failure to properly account for such funds." *See also Recent Developments— Attorney and Client—Rules Governing the Administration of Clients' Security Trust Fund of Maryland,* 26 Md.L.Rev. 369, 371 (1966) (commenting on limitation of coverage by use of term "defalcation"). Converting the funds of a client, or the funds held for another in a fiduciary capacity, clearly comes within the meaning of "defalcation." Obtaining money from a third party by means of a fraud does not.

In *Folly Farms, supra,* we adopted a "but for" test for determining whether there is a sufficient nexus between the attorney-client relationship and the loss suffered by the client. The language we employed in stating that test is significant: "but for the fact that the dishonest attorney enjoyed an attorney-client relationship *with the claimant* at the time of or prior to the loss, could such a loss have occurred?" *Id.* at 681, 387 A.2d 248 (emphasis added).

Finally on this point, we note that through the process of code revision the legislature has now made explicit that which we hold was formerly implicit. The statute as it existed prior to recodification in 1989 spoke of the authority of the trustees of the Fund to reimburse

> to the extent deemed proper and reasonable by the trustees, losses caused by defalcations of members of the bar of the State of Maryland, acting either as attorneys or as fiduciaries (except to the extent to which they are bonded). . . .

Article 10, § 43(b)(1), Md.Code (1957, 1987 Repl.Vol., 1988 Cum.Supp.). As recommended by the Revisor of Statutes

and enacted by the General Assembly, the statutory provision relating to distributions from the Fund now provides:

(b) *Distribution of Fund.*—To the extent the trustees consider reimbursement proper and reasonable, the trustees may use the Fund to reimburse *a person* for a loss that was caused by a defalcation of a lawyer if:

(1) the lawyer caused the loss while acting for *the person* as an attorney at law or a fiduciary: and

(2) *the person* cannot recover the money under a bond.

Section 10–312(b) of the Business Occupations and Professions Article, Md.Code (1989) (emphasis added). The "person" referred to in subsection (b)(1) is necessarily the same "person" referred to in the language that immediately precedes that subsection, and in subsection (b)(2). That "person" is the claimant, and therefore subsection (b)(1) must be read to limit recovery to those cases in which "the lawyer caused the loss while acting for the [claimant] as an attorney at law or a fiduciary. . . ."

There is no indication that the Revisor or the General Assembly intended to change the meaning of the law by this change of language. We have often said that:

Recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning. Thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so material that the intention of the General Assembly to modify the law appears unmistakably from the language of the Code.

*In re Special Investigation No. 236,* 295 Md. 573, 576–77, 458 A.2d 75 (1983). *See also Rohrbaugh v. Estate of Stern,* 305 Md. 443, 449–50, 505 A.2d 113 (1986); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 768, 501 A.2d 48 (1985). Moreover, the Revisor's note to § 10–312 specifically states that "[t]his section is new language derived without substantive change from former Art. 10, § 43(b)(2) and, except as it related to the purpose of the Fund, (1)." The legislative language did not, therefore, effect a change in

the law. Rather, it simply clarified a condition of recovery which we hold had been intended from the outset.

■ Monumental has a fall-back position. It argues that if we should find (as we have) that recovery is conditioned upon a showing of the existence of an attorney-client or fiduciary relationship between the person suffering the loss and the defaulting attorney, we should consider whether Mitchell was acting as a fiduciary for Monumental. Somewhat tentatively, Monumental suggests:

> On the issue of a fiduciary relationship it might be argued that in acting as an intermediary between Monumental and the insurance beneficiary, Mitchell was performing a fiduciary act for Monumental. Monumental received the claim from Mitchell and sent its proceeds check to Mitchell. In some sense of the word, and in this limited capacity, Mitchell was Monumental's agent and fiduciary for payment of the claim. Mitchell breached that relationship when he stole the funds entrusted to him by Monumental for delivery to the beneficiary.

We reject this argument. The wrong perpetrated by Mitchell upon Monumental was the fraudulent presentation of a counterfeit order, and by no stretch of the imagination can Mitchell be said to have been acting as a fiduciary for Monumental in that transaction.

There is a second level of analysis required by this argument, however. Without specifically saying so, Monumental has rather ingeniously turned to an entirely separate default by Mitchell. As we have earlier noted, Monumental's check was made payable to Mitchell's client, and was mailed to Mitchell. The endorsement of Mitchell's client was placed on the check, and it was then deposited into the clients' fund account of Mitchell's law firm. Mitchell thereafter converted the funds to his own use.

Monumental's contention that Mitchell was holding the funds as a fiduciary for Monumental when he converted them is without merit. Monumental did not send the check to Mitchell for delivery to the true beneficiary of the policy.

Monumental, having been defrauded by the forgery, sent the check to a person who was not entitled to the proceeds of the policy. Monumental's loss was complete at that point, and the fact that Mitchell may have doubly compounded his wrong by subsequently taking the funds from his client does not give rise to a legitimate claim by Monumental against the Fund.

The trustees' determination to disallow the claim on the ground that there was not an attorney-client or a fiduciary relationship between the claimant and the defaulting attorney is sustained, and we therefore have no occasion to address the additional grounds assigned by the trustees for disallowing the claim.

EXCEPTIONS OVERRULED; COSTS TO BE PAID BY MONUMENTAL LIFE INSURANCE COMPANY.

ELDRIDGE, J., concurs in the result only.