652 A.2d 660

**ADVANCE FINANCE CO., INC.**

v.

**The TRUSTEES OF the CLIENTS' SECURITY TRUST FUND OF the BAR OF MARYLAND.**

Misc. No. 8., Sept. Term, 1994.

Court of Appeals of Maryland.

Jan. 25, 1995.

Paul Mark Sandler (T. Allen Mott, Freishtat & Sandler, on brief), Baltimore, for appellant.

Benjamin Rosenberg (Douglas J. Furlong, Rosenberg Proutt Funk & Greenberg, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and ROBERT F. FISCHER, (Specially Assigned), JJ.

RODOWSKY, Judge.

This proceeding comes to us on exceptions under Maryland Rule 1228 j 2 from a determination by the trustees of the Clients' Security Trust Fund of the Bar of Maryland (the Fund) denying a claim submitted by Advance Finance Co., Inc. (Advance), a licensed consumer loan company. Advance makes loans to personal injury claim plaintiffs secured by assignments of any proceeds of the injury claims. Numerous clients of two attorneys, now disbarred, made such loans from Advance, but when the tort recoveries were received by the attorneys, they failed to remit the loan indebtedness to Advance. Advance sought reimbursement from the Fund which denied any reimbursement.

The former attorneys are Raymond A. Tubman (Tubman) and Glascoe A. Baker, Jr. (Baker). Baker was either an associate of Tubman, or Baker maintained an independent practice, working out of Tubman's office. Tubman and Baker arranged loans for their clients from Advance in order for the clients to pursue personal injury claims. The attorneys provided Advance with forms listing the client's name, certain other information, an estimate of the settlement value of the client's case, and the requested amount of the loan. Advance interviewed the client, and Advance decided whether it would extend credit to the client.

If Advance determined to make a loan, it was evidenced by a preprinted document that combined a "transactional statement" (consumer credit disclosures), a promissory note signed by the client, and a security agreement. This document will

be discussed further in Part III, *infra.* A separate document contained an "Authorization and Assignment," signed by the client, and an "Agreement of Attorney," which Advance intended for signature by the attorney representing the borrower-tort claimant. The "Authorization and Assignment" reads as follows:

"CLIENT: _____   D/A: _____

"In consideration of monies this day loaned, I irrevocably assign to you and authorize and direct my attorney(s) _____ to pay to you from the proceeds of any recovery in my captioned case all monies, including interest to date of receipt by you and costs lawfully incurred.

"I understand that this in no way relieves me of my personal primary obligation to repay you and that the signing of this form does not prohibit customary handling by you.

_____ (SEAL)

"Dated: _____
"Witness: _____"

The form of agreement for the attorney to sign reads:

### "AGREEMENT OF ATTORNEY

"The undersigned attorney for the client referred to above hereby agrees to comply fully with the Authorization and Assignment and pay over at time of receipt all monies then due and owing after ascertaining the exact amount due from Assignee and agrees to deliver to the named Assignee in writing the status of the claim with[in] 10 days of the request. This agreement is made in accordance with the holding in Hernandez v. Suburban Hospital Association, Inc. [,319 Md. 226, 572 A.2d 144 (1990) ].

_____(SEAL)

Attorney"

Between January and November 1991, at least seventy-seven loans were made by Advance to clients of Tubman and of Baker. Neither attorney ever signed the "Agreement of Attorney" portion of any of the loan documents. For some

initial period the attorneys remitted the money due to Advance from the settlements of the clients' cases. Thereafter, beginning in early 1992, Tubman and Baker ceased remitting to Advance.

In May 1992, Advance sued Tubman and Baker, and Advance subsequently obtained judgments by default against them. In October 1992, Advance filed a claim against each attorney with the Fund. Advance also pursued collection efforts against the borrowers, with some success in many instances. Advance sought reimbursement from the Fund for the net balances of the loans to clients of Tubman and Baker where the tort cases were settled and the amount to be paid to Advance was not remitted.

On March 17, 1994, the Fund denied the claims on the grounds that Tubman and Baker did not have an attorney-client relationship with Advance and that they were not fiduciaries for Advance. Advance then filed the exceptions that are before us. The Fund does not contend on this record that the failure of the attorneys to remit to Advance would not be a defalcation if the attorneys were fiduciaries for Advance. Nor does the Fund contend that Advance failed diligently to pursue reimbursement of its losses from available sources other than the Fund.

The Fund is a trust, administered by trustees appointed by this Court. Md. Rule 1228 b 1, b 2, and c 1. The Fund is financed in significant part by assessments on each lawyer practicing law in this State, the payment of which is a condition precedent to practice. See Md. Rule 1228 f 1. By Chapter 779 of the Acts of 1965 the General Assembly authorized this Court, by rule, to provide for the creation and operation of the Fund.[1] That statute, as revised and amend-

---

1. The history of the Fund is set forth in *Folly Farms I, Inc. v. Trustees of the Clients' Sec. Trust Fund of the Bar of Maryland,* 282 Md. 659, 387 A.2d 248 (1978), an opinion written for this Court by Judge Marvin H. Smith. While a practicing attorney, Judge Smith had chaired the committee of the Maryland State Bar Association (M.S.B.A.) that recommended a statewide clients' security fund. *See* 69 Transactions

ed, is now codified as Maryland Code (1989) §§ 10–310 through 10–312 of the Business Occupations and Professions Article (BOP).

The purpose of the Fund, as stated in BOP § 10–311(b), is "to maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers."

Rule 1228 b 3, drawing on the language of Chapter 779 of the Acts of 1965, states that

"[t]he purpose of the trust fund shall be to maintain the integrity and protect the good name of the legal profession by reimbursing, to the extent authorized by this Rule and deemed proper and reasonable by the trustees, losses caused by defalcations of members of the Bar of the State of Maryland ... acting either as attorneys or as fiduciaries (except to the extent to which they are bonded)."

The statute addresses the criteria for payment and the discretion of the trustees in BOP § 10–312(b) which reads as follows:

"*Distribution of Fund.*—To the extent the trustees consider reimbursement proper and reasonable, the trustees may use the Fund to reimburse a person for a loss that was caused by a defalcation of a lawyer if:

(1) the lawyer caused the loss while acting for the person as an attorney at law or a fiduciary;  and

(2) the person cannot recover the money under a bond."

Advance does not contend that either Tubman or Baker or both were acting as attorneys for Advance; rather, Advance contends that the attorneys were fiduciaries. In *Monumental Life Ins. Co. v. Trustees of the Clients' Security Trust Fund of the Bar of Maryland,* 322 Md. 442, 588 A.2d 340 (1991), we held that BOP § 10–312(b)(1) "must be read to limit recovery to those cases in which 'the lawyer caused the loss while acting for the [claimant] as an attorney at law or a fiduciary....'" *Id.* at 449, 588 A.2d at 343. Advance submits, *inter alia,* that

---

M.S.B.A. 209–34, 363–71 (1964);  70 Transactions M.S.B.A. 9–16, 339–41 (1965).

Tubman and Baker were fiduciaries for Advance because (1) the attorneys were trustees, or (2) the attorneys were fiduciaries for Advance under The Maryland Lawyers' Rules of Professional Conduct (Conduct Rules), Rule 1.15, "Safekeeping Property."

■ In addressing these contentions we do so under the standard for judicial review of decisions of the trustees of the Fund set forth in Rule 1228 j 2, reading in relevant part as follows:

> "The decision of the trustees shall be deemed prima facie correct and the exceptions shall be denied unless it is shown that the decision was arbitrary or capricious, or unsupported by substantial evidence on the record considered as a whole, or was not within the authority vested in the trustees, or was made upon unlawful procedure, or was unconstitutional or otherwise illegal."

This standard of review is analogous to the standard of review applicable to administrative agencies, specifically, " 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.' " *Folly Farms I, Inc. v. Trustees of the Clients' Sec. Trust Fund of the Bar of Maryland*, 282 Md. 659, 670, 387 A.2d 248, 253 (1978) (quoting *State Ins. Comm'r v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309, 236 A.2d 282, 292 (1967)).

As hereinafter explained, Advance may be an eligible claimant against the Fund because of the fiduciary duties imposed by Conduct Rule 1.15. Advance's argument based on the creation of a trust nevertheless presents an instructive contrast that illuminates the analysis underlying our holding.

I

From the standpoint of the law of agency, and disregarding for the moment that the agents are lawyers whose principals are clients, the common law rules that govern the civil liability of Tubman and Baker to Advance are synthesized in Restatement (Second) of Agency § 342 (1958). That section reads:

"(1) An agent who receives money or other thing from his principal to pay or transfer to another person is not thereby liable to the other.

"(2) An agent whose promise to pay is primarily for the benefit of a third person may be liable in an action of contract to the third person for his failure to perform his promise.

"(3) If an agent receives money in trust from the principal for the benefit of another, the agent is liable as a trustee to the other."

Restatement § 342(1) accords with Maryland law as enunciated in *Mish v. Schindel*, 164 Md. 164, 164 A. 166 (1933). In that case the principals were persons who had guaranteed loans for a corporation that became insolvent. The principals, in an effort to effect a composition with their creditors, agreed to be represented in negotiations by a committee of three persons. The principals also agreed on the amount that each would contribute to the committee, their agent, for payment by it to creditors of the principals. One of the principals, the plaintiff, was among those principals who were personally liable to banks which would not settle for less than 100% of the indebtedness owed to them by the insolvent. Anxious over the delay in resolving his personal liability, the plaintiff paid the insolvent's full indebtedness to the banks and took an assignment from the banks of their claims against the insolvent and the other guarantors. The amount paid by the plaintiff to the assignors exceeded his agreed contribution to the committee. The committee credited the plaintiff's payment to the banks in satisfaction of the plaintiff's promise to contribute to the committee, but the committee would not reimburse the plaintiff for the excess paid to the banks. When the plaintiff, as assignee of the bank-creditors, sued the committee, this Court held that the agent was entitled to a directed verdict. This Court said that the plaintiff

"could not, merely because he is holder of the notes, enforce payment from the agents, even though money for payment was placed at their disposal, because agents in that situation are accountable only to their principals. 1 Mechem, *Agen-*

*cy,* secs. 1447 and 1449; *Amer.Law Inst. Restatement Agency,* sec. 565; note, 5 *L.R.A.* 431. There is no evidence of a superadded agreement of the committee to make full payment to [plaintiff], or to reimburse him for his excess payment...."

*Id.* at 168, 164 A. at 168.

■ Thus, the promise of the agent to the principal to pay as directed by the principal ordinarily does not create civil liability on the agent to the intended payee.

■ Restatement § 342(2) elevates the analysis to the plateau of a contract between the principal and agent to which the third party payee is a beneficiary with enforceable contract rights against the agent based on the agent's express or implied promise to the principal to execute the principal's instructions. This Court has recognized that, depending on the facts, including primarily the intention of the client to benefit a third party, an agreement between an attorney and client may be enforceable by the third party in contract, or, based on the attorney's negligent failure to perform a contractually assumed duty to the third person, in tort. *See Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985). The Fund, however, does not pay clients or non-clients on claims against an attorney for breach of a contract or for professional negligence.

■ In the instant matter the "Agreement of Attorney" portion of the loan documents is drafted to create direct privity of contract between the tort claimant-borrower's attorney and Advance. Where an attorney had contracted directly with his client's creditor, and with his client's authority, to disburse to the client's creditor from tort claim settlement funds, we enforced the attorney's civil liability for damages for breach of the contract in *Hernandez v. Suburban Hosp. Ass'n, Inc.,* 319 Md. 226, 572 A.2d 144 (1990). But, because the Fund does not reimburse for loss caused by breach of contract, it is immaterial in the instant matter that Tubman and Baker did not sign the "Agreement of Attorney," and it is immaterial whether the attorneys, orally or by their conduct, contracted

directly with Advance to perform the promises set out in the unsigned "Agreement of Attorney."

■ The next plateau of the Restatement principles, set forth in § 342(3), is an agreement between principal and agent under which the agent holds the money from the principal in trust for the benefit of the third party.

"Although an agent receives money from his principal for payment to another and, by implication or otherwise, promises the principal to pay the other, he does not ordinarily become a trustee of the money, even though directed to pay over the specific money."

Restatement (Second) of Agency § 342, comment b on Subsection (3). The loan transactions, as structured by Advance, do not transcend the ordinary, so as to create a trust. In Hernandez, we recognized a similar assignment by the client to a third party as having been taken by the assignee as security for the client's debt obligation to the assignee. Hernandez, 319 Md. at 236–37, 572 A.2d at 149. Thus, the trustees of the Fund made no error of law in concluding that the assignments in the instant matter did not constitute Tubman and Baker fiduciaries in the sense that they were trustees of trusts of which Advance was the beneficiary.

## II

■ Advance alternatively contends that Tubman and Baker are fiduciaries, *for Advance,* as a result of their ethical obligations under Conduct Rule 1.15(b). That rule provides:

"(b) Upon receiving funds or other property in which a client *or third person* has an interest, a lawyer shall promptly notify the client *or third person.* Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client *or third person* any funds or other property that the client *or third person* is entitled to receive and, upon request by

the client *or third person,* shall promptly render a full accounting regarding such property."

(Emphasis added).

Here, Tubman and Baker were the intermediaries between their clients and Advance in arranging the loans by Advance. On the present record the clear inference is that the attorneys knew that their clients were assigning the proceeds of any tort recovery to Advance as security for the loans. Further, in *Hernandez,* we held that the security assignment of the tort claim proceeds created an equitable lien in favor of the assignee that survived the discharge in bankruptcy of the debtor-assignor, if the lien were not specifically set aside in the bankruptcy proceeding. *Hernandez,* 319 Md. at 237, 572 A.2d at 149. Thus, as the case has been presented to date, Tubman and Baker had instructions from their clients to pay, out of the proceeds of any tort recovery, an amount sufficient to satisfy the "equitable lien" of Advance on the proceeds.

Assuming that the portion of the proceeds assigned to Advance had not been remitted by Tubman and Baker to their clients, the attorneys would appear clearly to be civilly liable to their clients for failing to honor their instructions. And, if the clients were the claimants against the Fund for their losses due to defalcation, we would have no difficulty in concluding that the losses were caused by the attorneys, acting as attorneys, so that the clients' losses would be eligible for reimbursement from the Fund. Advance submits that Conduct Rule 1.15 produces the same result because it creates a fiduciary duty, with respect to the proceeds, running from the borrowers' attorneys to Advance, and that the loss was caused by the attorneys acting as fiduciaries for Advance.

The comment, prepared by The American Bar Association, to Conduct Rule 1.15 includes the following observations:

"A lawyer should hold property of others with the care required of a professional fiduciary....

. . . .

"Third parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody.

A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party.

"The obligations of a lawyer under this Rule are independent of those arising from activity other than rendering legal services. For example, a lawyer who serves as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction."

G. Hazard, Jr. and W. Hodes, *The Law of Lawyering* § 1.15:301, at 459 (2d ed. 1990, 1994 Supp.), states:

"Rule 1.15(b) concerns notification, delivery and accounting with respect to funds held by a lawyer as a fiduciary. It is derived from DR 9–102(B)(1) and (B)(4). However, like Rule 1.15(a), it extends its protection to include third party interests as well as those of clients....

. . . .

"The most common situation envisioned by Rule 1.15(b) is receipt by a lawyer of funds in which a client has an interest—an insurance company's settlement draft in a contingency fee case, for example."

Addressing the problem of conflicting claims between the client and a third party to funds in the attorney's hands, the same authors say:

"[T]he most difficult situation arising under Rule 1.15(b) is where both the client and a third party claim an interest in funds being held by a lawyer. A common example is where the proceeds from an insurance settlement are intended to pay outstanding medical and hospital bills, as well as recompense to the client. If the lawyer turns all of the funds over to the client and they are dissipated or concealed, the third

party medical providers might have an action against the lawyer."

*Id.* § 1.15:302 at 459–60.

Prior to the adoption of the current Conduct Rules former Disciplinary Rule 9–102(B)(4) did not expressly recognize an attorney's obligation to a non-client. DR 9–102(B)(4) provided that

"[a] lawyer shall:

. . . .

(4) [p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

Appendix to former Maryland Administration Rule 1230, Code of Professional Responsibility, 2 Md. Rules 449 (Md.Code 1985 Repl.Vol.). This Court, however, held that an attorney who was disbursing tort claim settlement funds was required by DR 9–102(B)(4) "promptly to remit a client's funds to third parties for the account of the client where the client has authorized the attorney so to remit." *Attorney Grievance Comm'n v. Morehead,* 306 Md. 808, 818, 511 A.2d 520, 525 (1986). There, approximately $800 had been received by the plaintiff's attorney from an insurer in reimbursement of medical bills, deposited into the attorney's escrow account (which was overdrawn), and not paid to the treating physician until fourteen months after receipt by the attorney.

This Court similarly applied DR 9–102(B)(4) to an attorney's failure to disburse tort settlement funds, per the client's instructions, to health care providers in *Attorney Grievance Comm'n v. Singleton,* 311 Md. 1, 16, 532 A.2d 157, 165 (1987), and in *Attorney Grievance Comm'n v. Velasquez,* 301 Md. 450, 483 A.2d 354 (1984).

We are mindful that the Conduct Rules "are not designed to be a basis for civil liability." Scope Note to Conduct Rules, 2 Md. Rules 475 (Md.Code 1994). But, the instant proceeding is not an action seeking directly to impose civil liability on Tubman and Baker. The proceeding is a claim by Advance

for reimbursement by the Fund. The question is whether an attorney acts as a fiduciary for a non-client within the meaning of BOP § 10–312(b)(1) and of Md. Rule 1228 b 3, relating to the Fund, when the attorney disburses client funds from the attorney's trust account to a non-client, at the instructions of the client and pursuant to the obligations recognized in Conduct Rule 1.15. Our answer is "yes."

The alternative to a "yes" answer is to tell the non-client victim of an attorney's defalcation that, although as a matter of legal ethics the attorney is the fiduciary of the non-client victim, it is problematic whether that fiduciary obligation is civilly enforceable as the basis for a monetary recovery against the attorney. That is precisely the kind of result that the Fund was created to avoid.[2]

The initial report of the M.S.B.A. Committee that recommended a clients' security fund proposed reimbursement "if the losses are caused by the defalcation of a lawyer (acting either as an attorney or as a fiduciary . . .)." 69 Transactions M.S.B.A. at 369 (1964). At the M.S.B.A. annual meeting of 1964, Mr. Smith, chairman of the committee, was questioned from the floor by Rignal W. Baldwin, Esq., who drew upon his experience as a former President of the Bar Association of Baltimore City with the voluntary clients' security plan of that association. The following colloquy transpired:

> "[I]n the City we had under our rules and regulations which we adopted the discretion to determine whether we would cover lawyers in a fiduciary capacity or not, and in the particular case where we either paid out or allocated $10,000 within the last month the lawyer was an execution [sic]. He had drawn the will. We think the will was a false will and everything about it was false, and he got into the whole scheme by virtue of being a member of the Bar, otherwise he couldn't have got into it. We therefore exercised our

---

**2.** Our concern here is with a fiduciary obligation of the attorney to the non-client, in isolation. We do not imply that the non-client would not have an action against the attorney in tort for conversion, or an action in contract for money had and received.

discretion to cover him even though what he did was done solely in a fiduciary capacity because it all emanated, so to speak, it was initiated by his being a member of the Bar.

"I think it is important for us to know whether you and your Committee feel or will have that discretion, and if you do whether you would feel that a lawyer would ordinarily be covered even though what he did was as a fiduciary.

"I add this one thought to it, and it was the unanimous thought of our Clients' Security trust of five that the public doesn't know the difference between a lawyer as a lawyer who might get a settlement and put the money in his pocket, and a lawyer who was an executor and trustee and thereby gets funds and withholds them in that fiduciary capacity, and since the whole idea is in respect of our image with the public it was our feeling that ordinarily a lawyer-fiduciary would be covered.

"So I am asking you in the light of that about your view.

"MR. SMITH: Very definitely, and if you will notice at the bottom of Page 69 in the last two lines of Section 50 it was the intent 'if the losses are caused by the defalcation of a lawyer acting either as an attorney or as a fiduciary except to the extent to which he is bonded'.

"Does that answer your question, sir?

"MR. BALDWIN: It does."

*Id.* at 225–26.

In *Folly Farms*, 282 Md. 659, 387 A.2d 248, we adopted a "but for" construction of the Fund coverage for losses caused by the services of an attorney, and we referred to the Smith–Baldwin colloquy, *inter alia*, for support for that holding. *Id.* at 680, 387 A.2d at 259. We also quoted the reasoning of John W. Bryan, a chairman of the A.B.A. Committee on Clients' Security Fund, to the effect "that it is sometimes very difficult for the average layman to distinguish between a dishonest attorney and a dishonest fiduciary." *Id.* at 679–80, 387 A.2d at 258.[3]

---

3. The full quote from Bryan is:

The Fund's *25th Anniversary Report, July 1, 1966–June 30, 1991* reviewed the sources of approved claims. "[T]hefts of real estate proceeds or related escrows," "[t]hefts of estate and fiduciary moneys," and "[t]hefts of accident/injury settlement proceeds, and related escrows" were the leading categories either in percentage of approved claims or of approved payments. *Id.* at 4. At the argument before us counsel for the Fund acknowledged that the Fund has paid non-client victims of attorney defalcations in the real estate settlement context and that the analogy to Fund reimbursement in that context was "the most difficult one" with which the Fund had to deal in denying Advance's claim. Counsel also acknowledged that, in the personal injury settlement context, the Fund, on a claim against it by the client, has issued joint payee checks to the client and an unpaid health care provider of the client.

We see little difference between these Fund approved payments and the claim of Advance as it has been presented to us. It is true that, when the Fund was created, security assignments of the proceeds of personal injury claims were of uncertain validity, there was no decision of this Court recognizing an equitable lien on the proceeds in favor of a tort plaintiff's creditor, this Court had not expressly held that an attorney disbursing a tort settlement has an ethical obligation to a creditor to pay that creditor, if so instructed by the client, and this Court had not yet expressly incorporated that obligation into the Conduct Rules. Nevertheless, it is consistent

---

" 'Some funds by rule deny payment of claims when the lawyer was acting in the course of a fiduciary capacity rather than in a professional capacity as a lawyer. For example, when money comes into the possession of the lawyer who is acting primarily as an executor, trustee, escrow or investment conduit, some funds exclude claims.
" 'The distinction may be a tenuous one in the public's eye. In the absence of a state statute requiring a realistic indemnity bond, subject to court approval, the better clients' security fund procedure may be to expand the voluntary coverage of the fund to the client whose lawyer is acting as a fiduciary, since the public is not prone to recognize the refined distinction.' Bryan, *Clients' Security Fund Ten Years Later*, 55 A.B.A. J. 757, 759 (1969)."
*Folly Farms*, 282 Md. at 680, 387 A.2d at 258–59.

with the purposes of the Fund to recognize that the fiduciary ethical obligation to a non-client that is embodied in Rule 1.15 is a fiduciary obligation under the Fund statutes and rules.

### III

Advance recognizes that, if its exceptions are sustained, a remand to the Fund trustees is required, at least for the purpose of determining the amount of reimbursement. As previously noted, the trustees have a discretion to reimburse in an amount that the trustees consider to be proper and reasonable. BOP § 10–312(b). Some of the factors that the trustees may consider in exercising that discretion are listed in Md. Rule 1228 i 3. The factors include "[t]he amounts available and likely to become available to the trust fund for payment of claims." Rule 1228 i 3(i). A corollary of the quoted rule is that "[n]o claimant ... has any right in the trust fund as beneficiary or otherwise." Md. Rule 1228 i 2.

Also on remand the trustees, in their discretion, may under-take to analyze whether defalcation by the attorneys was the *cause* of a claimed loss on a particular loan. Without the benefit of testimony, legible exhibits, and legal briefing of the issue by counsel, we have some difficulty in construing the loan documents. The basic form containing consumer loan disclosures and the promise to repay states a day certain on which the loan is to be repaid. That form calls for installment payments, but the amount of the periodic payments is not specified. That loan document contains no express accelera-tion of the stated due date upon receipt by the borrower of proceeds of the assigned tort claim. If the security assign-ment of the tort claim proceeds requires some payment to Advance only if the loan, in whole or in part, is due and payable by the borrower at the time of receipt of the proceeds, it may be that, as to some loans, there was no obligation on Tubman or Baker to disburse to Advance. In that event it would seem that a defalcation, if any, would not be a *cause* of loss to Advance.

*FINAL DETERMINATION OF THE TRUSTEES DENY-
ING THE CLAIM VACATED; CASE REMANDED FOR
FURTHER PROCEEDINGS IN ACCORDANCE WITH
THIS OPINION; COSTS TO BE PAID BY THE CLIENTS'
SECURITY TRUST FUND OF THE BAR OF MARYLAND.*