REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2344

September Term, 2012

---

AMERICAN ASSET FINANCE, LLC

v.

TRUSTEES OF
THE CLIENT PROTECTION FUND
OF THE BAR OF MARYLAND

---

Eyler, Deborah S.,
Kehoe,
Rubin, Ronald B.
        (Specially Assigned),

                    JJ.

---

Opinion by Eyler, Deborah S., J.

---

Filed: February 28, 2014

In this appeal, American Asset Finance, LLC ("AAF"), the appellant, challenges a decision of the Trustees of the Client Protection Fund of the Bar of Maryland ("the Fund"), the appellee, to deny in all or in part four claims submitted by AAF. The Fund's final determination of AAF's claims was affirmed on judicial review by the Circuit Court for Baltimore County. AAF presents one question for our review, which we have rephrased: Did the Fund err in determining that AAF lacked standing to seek compensation with respect to three of its claims and part of a fourth claim?[1] For the reasons to follow, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

The facts are undisputed. AAF is a limited liability company registered under the laws of New Jersey. It is owned and operated by Sherry and Tim Foley. As part of its business, AAF purchases from attorneys interests in settlements and estates that are not yet subject to disbursement. AAF pays the attorney a lump-sum cash payment in exchange for the attorney's promise to assign to AAF a portion of his or her interest in the proceeds of the settlement, or estate disbursement. The amount of the assignment (*i.e.*, AAF's interest) increases over time to give the attorney an incentive to promptly and efficiently close out the case and disburse AAF's share to it.

---

[1]As worded by AAF, the question presented is:

Did the Fund err in denying compensation to AAF for [attorney Bradley] Schwartz's theft of AAF's property from his attorney trust account by finding AAF lacked standing to seek reimbursement from the Fund?

In the instant case, between May 2007 and July 2008, AAF entered into four such agreements with one Bradley Schwartz, who at that time was a member of the Maryland Bar. In the first, on May 22, 2007, AAF agreed to pay Schwartz $100,000 in exchange for his assignment of the first $110,000 of $149,000 in attorneys' fees from a $449,000 total settlement. In the second, on September 18, 2007, AAF agreed to pay Schwartz $60,000 in exchange for his assignment of the first $64,800 of $83,333.33 in attorneys's fees from a $250,000 total settlement. In the third agreement, on June 16, 2008, AAF agreed to pay Schwartz $50,000 in exchange for his assignment of the first $54,000 of $62,000 in attorneys' fees from a $150,000 total settlement. In the fourth and final agreement, executed on July 25, 2008, AAF agreed to pay Schwartz $65,000 in exchange for his assignment of the first $70,200 of $150,000 in attorneys' fees from a $362,000 total settlement.

AAF also entered into an assignment agreement with one of Schwartz's clients, Tara Jackson. Jackson was the beneficiary of an estate in a case related to the case giving rise to AAF's September 18, 2007 assignment agreement with Schwartz. On October 26, 2007, AAF agreed to pay Jackson $2,500 in exchange for her assignment of $2,750 of her $9,000 interest in the estate.

The four assignment agreements between Schwartz and AAF all were structured the same way and used nearly identical language, although the amount paid to Schwartz, the amount AAF was assigned, and the penalties for late payment varied. Each was titled, "Assignment of Interest in Settlement and Limited Irrevocable Power of Attorney"

2

("Assignment Agreement"). Schwartz was designated as the "Assignor" and AAF as the "Assignee."

In the recitals and Section 1, Schwartz agreed that he was an attorney of record in a specified case, had an interest in a settlement of a specified amount, and wished to "receive an immediate lump sum cash payment for a portion of [his] interest in the Settlement and to that end wish[ed] to assign such interest to [AAF]." In each Assignment Agreement, Schwartz represented the extent of his interest in the particular settlement and agreed that he was "hereby sell[ing] and assign[ing] to [AAF] [his] entire right, title and interest in and to [his interest in the settlement] to the extent described herein." Thereafter, each Assignment Agreement set forth the exact sum Schwartz was assigning to AAF, as well as a formula for increasing that amount incrementally depending upon how long it took for AAF to receive its payment.[2]

Section 2 set out fourteen "Representations, Warranties, and Agreements" by Schwartz, including that: he owned title to his interest in the settlement free and clear of any liens or claims; he understood that AAF was "relying on [his] professional expertise and the representations made by [him] in pricing this transaction"; he would "take all steps necessary

---

[2]For example, in the June 16, 2008 Assignment Agreement, Schwartz assigned AAF $54,000 of his interest in the settlement. If he did not pay AAF that amount by September 12, 2008, he would owe an additional $4,000. If he did not pay AAF by December 12, 2008, another $4,000 penalty was added. Finally, if he did not pay AAF by March 12, 2009, in addition to the $8,000 penalty already accrued, Schwartz would be obligated to pay a penalty of $1,500 for every month thereafter until payment was made in full.

to ensure that [AAF] receive[d] the Property"; he was "an attorney competent to understand the transaction provided for in this agreement"; after receiving the settlement proceeds and until such time as AAF's interest was disbursed, he would "hold [AAF's interest] in safekeeping as [its] agent and fiduciary"; and he would disburse to AAF its interest in the settlement within four days of his receiving it and depositing it in his IOLTA account.

At Section 12 of each Assignment Agreement, Schwartz agreed to execute and/or to authorize AAF to execute a financing statement securing AAF's "first priority security interest" in its assigned interest in the settlement, which AAF agreed to terminate upon receiving payment.

Each Assignment Agreement included an attached and incorporated Power of Attorney agreement by which Schwartz appointed AAF his attorney-in-fact for the purposes of endorsing any checks payable to him with respect to the particular case and executing documents necessary to effectuate the payment of its interest in the settlement of that case.

Finally, in each case, Schwartz executed a "Notice of Assignment, Irrevocable Direction of Payment, & Authorization to Release Information" ("Notice of Assignment"). Each Notice of Assignment was addressed to defense counsel in the underlying case in which the settlement had been reached. It informed defense counsel of the Assignment Agreement between Schwartz and AAF, and directed defense counsel to pay AAF its interest in the settlement directly. AAF agreed, however, to hold each Notice of Assignment in "escrow"

4

and only deliver it to defense counsel if Schwartz failed to respond within seven days to a request for an update on the status of the case.

AAF's Assignment Agreement with Jackson differed in certain respects. As relevant here, Jackson warranted that she had "irrevocably authorized and directed [Schwartz] to arrange for delivery of [AAF's interest] to him and [for him] to remit it to [AAF] immediately on receipt in accordance with [AAF's] instructions." She further warranted that Schwartz would act "as [AAF's] fiduciary" in this respect.

Within days of executing each Assignment Agreement, including the one between AAF and Jackson, AAF wired the agreed upon lump-sum payment directly to Schwartz, less a $20 wire transfer fee. In each case, within months, the settlement proceeds in the underlying case were disbursed to Schwartz and deposited in his IOLTA account. Schwartz never paid AAF its assigned interest in any of the proceeds in any of the cases, however.

On March 23, 2009, Schwartz was disbarred by consent from the practice of law in Maryland based upon his having misappropriated funds deposited in his IOLTA account. *See Attorney Grievance Comm'n v. Schwartz*, 408 Md. 34 (2009). Thereafter, AAF filed three separate claims with the Fund seeking reimbursement of the amounts it maintained were owed to it under the Assignment Agreements from May 2007, June 2008, and July 2008, and one combined claim seeking reimbursement of the amounts it maintained were owed to it under the September 2007 Assignment Agreement between it and Schwartz and the October 2007 Assignment Agreement between it and Jackson. It attached copies of the

5

Assignment Agreements to its claims. The total sum sought by AAF was $391,433.33, which included the agreed assignment in each case plus penalties that had accrued under the terms of each agreement.

The Fund investigated the claims. In each case, Schwartz was asked to respond to the claim. In each case involving an assignment by Schwartz, he responded that he never had represented AAF in any capacity, but that he had borrowed money from AAF at a high interest rate and "[d]ue to economic circumstances" had been unable to repay those loans. In the Jackson sub-claim, he represented that he had paid the $2,500 he had received from AAF on her behalf directly to her, but had been unable to pay AAF its assigned interest. The Fund's investigation revealed, however, that Jackson never received any funds from Schwartz.

The Fund consolidated the three claims involving the Assignment Agreements between Schwartz and AAF and, on May 13, 2010, issued an "Initial Determination" denying the consolidated claims. It explained that, while each "transaction" between AAF and Schwartz was memorialized in an Assignment Agreement, each amounted to a

> personal loan from [AAF] to Schwartz, secured by the grant of an interest by Schwartz to [AAF] of Schwartz['s] expectancy in an attorneys [sic] fee which he did not yet earn and did not yet receive. The Claims are not eligible for payment from the Fund since there is no attorney-client or fiduciary relationship between [AAF] and Schwartz. A debtor-creditor relationship is the actual nature of the relationship between [AAF] and Schwartz and not a fiduciary relationship or attorney-client relationship.

6

Because the "statute, the rules and the regulations governing the Fund" require that there be or have been an attorney-client or fiduciary relationship between the defalcating attorney and the claimant, and there was no such relationship here, the Fund denied AAF's claims.

In the unconsolidated claim, the Fund denied the sub-claim arising out of the Assignment Agreement between AAF and Schwartz for the same reasons as in the consolidated cases, but granted, in part, the sub-claim arising from the Assignment Agreement between AAF and Jackson. It explained that, under the authority of *Advance Finance Co. v. Trs. of the Clients' Sec. Trust Fund*, 337 Md. 195 (1995), because Jackson, a client, had authorized and directed Schwartz, her attorney, to accept the settlement proceeds and pay AAF its share of those proceeds, Schwartz and AAF had a fiduciary relationship giving rise to a compensable claim. It awarded AAF $2,500, which was the amount it had wired to Schwartz on behalf of Jackson. The Fund denied AAF's claim for an additional $2,000 AAF claimed was due to it under the terms of its Assignment Agreement with Jackson, finding that that amount was "lost interest."

On May 28, 2010, AAF exercised its right to seek reconsideration of the Initial Determinations. It challenged the denials of the consolidated claims and the unconsolidated sub-claim arising out of its Assignment Agreements with Schwartz. (It did not challenge the partial denial of the Jackson sub-claim.) It argued that the transactions underlying these denied claims were assignments of an interest in property, not loans. It maintained that there were two separate bases to support a finding that it had a relationship with Schwartz giving

7

rise to a compensable claim: 1) an attorney-client relationship evidenced by the language in the agreements stating that it was relying upon Schwartz's professional expertise; and 2) a fiduciary relationship that formed when Schwartz agreed to receive the settlement funds and hold AAF's shares of those funds in his IOLTA account until they could be disbursed to AAF. AAF requested a hearing on its motion for reconsideration.

The Fund held a hearing and, on April 15, 2011, issued its Final Determination in the consolidated claims and in the unconsolidated claim. It explained that there were "several grounds upon which the Trustees could deny the Claims," but that it was denying the claims based solely upon its conclusion that AAF did not have standing "to make a claim with the Fund because of a lack of attorney-client or fiduciary relationship with Schwartz." With respect to the absence of an attorney-client relationship, the Fund found that the

> only legal service Schwartz was to provide to [AAF] was the collection and disbursement of the settlement and estate proceeds from the case[s] in which Schwartz was the attorney. But these were not legal services to be provided *to [AAF]*. Schwartz was already bound, as the attorney for his law client, to collect and disburse the settlement proceeds. Moreover, the language of the Assignment belies an attorney-client relationship: nothing in that language suggests that [AAF] would be deferring in their dealings to legal expertise and judgment of Schwartz. Finally, there was no legal representation agreement
> . . . .

(Emphasis in original.)

With respect to the absence of a fiduciary relationship, the Fund explained that the "kind of fiduciary relationship necessary to have standing to make a claim with the Fund did not exist between [AAF] and Schwartz." This was so because the Fund's regulations define

8

the term "fiduciary relationship" to mean "a lawyer acting in a fiduciary capacity *traditional and customary in the practice of law*, such as a court-appointed lawyer, a personal representative of a probate estate, a trustee of an express trust, a guardian, a custodian acting per statute, or an attorney-in-fact by written appointment." (Emphasis supplied by Fund.) In light of this definition and the history of the Fund, the Fund reasoned that, for a loss to be compensable, the "defalcating Maryland attorney must have acted not as a *general* fiduciary, but instead in the more limited capacity contemplated by the language of the Regulation governing operations of the Fund." (Emphasis in original.)

The Fund found unpersuasive AAF's reliance on the language in the Assignment Agreements that stated that Schwartz agreed to act as AAF's fiduciary, explaining that, although the parties to those agreements were bound by their terms, it was not. Instead, it looked to the "real relationship" between AAF and Schwartz, which it concluded was not "a fiduciary relationship that is 'traditional and customary in the practice of law.'" Rather, the "representations, warranties and covenants made by Schwartz . . . [were] more like those made by an applicant for a loan and contained in a promissory note or security agreement." The Fund found that the "essence" of the assignments was an agreement by Schwartz to repay a loan with interest at a rate of between 32 and 40 percent per annum.

The Fund explained that when a lawyer acts as a traditional fiduciary he or she "interacts with a third person or entity on behalf of a client." For example, if a client directs his or her lawyer to pay funds directly to a third party to discharge the client's debt, the

9

lawyer, once in receipt of those funds, becomes a fiduciary of the third party. Here, Schwartz entered into the agreements with AAF directly and for his own benefit, not on behalf of a client. The Fund ruled that, in that circumstance, Schwartz was not a fiduciary of AAF and that AAF lacked standing to make a claim against the Fund.[3]

On July 27, 2011, AAF filed a petition for judicial review in the circuit court. On January 11, 2013, the circuit court issued an order affirming the Final Determination of the Fund. This appeal followed.

STANDARD OF REVIEW

Rule 16-811(i)(2) states that judicial review of a final decision of the Fund is governed by the same Rules governing judicial review of the final decision of an administrative agency generally. A decision of the Fund is "deemed prima facie correct" and shall be upheld unless "arbitrary, capricious, unsupported by substantial evidence on the record considered as a whole," *ultra vires*, unconstitutional, or illegal. *Id.*

We have described the deferential standard of review of administrative appeals as follows:

> In [an] appeal from the judgment of the circuit court on judicial review of a final agency decision, we look "through" the decision of the circuit court and review the decision of the [agency]. *People's Counsel v. Country Ridge Shopping Ctr., Inc.*, 144 Md.App. 580, 591, 799 A.2d 425 (2002). *See also*

---

[3]The Fund also issued a Final Determination on the Jackson sub-claim, reaching the same result as its Initial Determination. As mentioned, AAF had not challenged the Fund's decision to award it $2,500 of the $4,500 sub-claim. It also did not seek judicial review of that aspect of the Fund's Final Determination.

*Ins. Comm'r v. Engelman*, 345 Md. 402, 411, 692 A.2d 474 (1997) (reviewing a final decision of the Insurance Commissioner). Our review of the agency decision is circumscribed. *See Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67, 729 A.2d 376 (1999). It is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv. v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226 (1994).

In applying these standards, we review the record in the light most favorable to the agency and "defer to [its] fact-finding and drawing of inferences" if supported by any evidence in the record. *Banks, supra*, 354 Md. at 68, 729 A.2d 376. We review purely legal decisions *de novo*. *See People's Counsel v. Loyola College in Md.*, 406 Md. 54, 67–68, 956 A.2d 166 (2008). Even so, with respect to an agency's legal conclusions, we give "considerable weight" to the agency's "interpretation and application of the statute which the agency administers." *Banks*, at 69, 729 A.2d 376. *See also Marzullo v. Kahl*, 366 Md. 158, 173, 783 A.2d 169 (2001) (appellate court must accord appropriate deference to agency expertise even with respect to conclusions of law). In the context of appellate review of an administrative agency decision on a mixed question of law and fact, we apply the substantial evidence test. *Charles County Dep't of Social Servs. v. Vann*, 382 Md. 286, 296, 855 A.2d 313 (2004).

*People's Ins. Counsel Div. v. State Farm Fire and Cas. Ins. Co.*, 214 Md. App. 438, 523-24 (2013), *cert. granted on other grounds*, ___ Md. ___, Case No. 21, Sept. Term 2014 (Jan. 24, 2014).

## DISCUSSION

Before turning to the contentions of the parties, we briefly outline the statutory and regulatory structure governing the Fund. The Fund is a trust operated and administered by nine Trustees appointed by the Court of Appeals. *See* Md. Rule 16-811(b). Its purpose is "to maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers." Md. Code (2010 Repl. Vol.), section 10-311(b) of the Business

11

Occupations and Professions Article ("BOP"); *see also* Md. Rule 16-811(a)3. It is financed

by means of an annual assessment levied on all actively practicing members of the Maryland

Bar. *See* BOP § 10-311(c). The Fund may, in its discretion, reimburse a "loss that was

caused by a defalcation of a lawyer if: (1) the lawyer caused the loss while acting for the

person as an attorney at law or a fiduciary; and (2) the person cannot recover the money

under a bond." BOP § 10-312(b).

Rule 16-811(c) empowers the Trustees to "authorize payment of claims in accordance

with [the] Rule" and to "adopt regulations for the administration of the Fund and the

procedures for the presentation, consideration, recognition, rejection and payment of claims."

*Id*. at (c)1.(ii) & (iii). In reviewing a claim for a loss, the Trustees must determine "whether

a claim merits reimbursement from the Fund, and if so, the amount of such reimbursement,

the time, place, and manner of its payment, the conditions upon which payment shall be

made, and the order in which payments shall be made." *Id*. at (h)1. In accordance with this

authority, the Fund has promulgated regulations that include, as relevant here, the regulation

governing "Eligibility" that was discussed in the Fund's Final Determinations in this case.

That regulation provides in pertinent part:

1. Attorney-client or fiduciary relationship.

> No claim will be recognized by the Trustees unless an
> attorney-client or fiduciary relationship existed with a member
> of the Bar of the Court of Appeals of Maryland when the loss
> was incurred as a result of a defalcation by the said Maryland
> attorney. The Trustees consider that a "fiduciary relationship"
> means, for example, a lawyer acting in a fiduciary capacity

12

traditional and customary in the practice of law in Maryland, such as a court-appointed lawyer, a personal representative of a probate estate, a trustee of an express trust, a guardian, a custodian acting per statute, or an attorney-in-fact by written appointment.

In the instant case, AAF contends it had standing to make a claim for compensation arising out of each of its four Assignment Agreements with Schwartz. This is so, it argues, because "the law and the facts" reflect that it had an attorney-client relationship with Schwartz. It points to "numerous representations made by Schwartz" relative to legal services he was to provide AAF. Moreover, AAF argues that its claims were compensable because Schwartz was acting as its fiduciary and that the fiduciary relationship between them was "traditional and customary in the practice of law."

The Fund responds that its decision must be affirmed because it is legally correct and supported by substantial evidence in the record. It asserts that Schwartz could not have formed an attorney-client relationship with AAF because, in each underlying case in which he assigned his interest in a portion of the settlement proceeds, he had an attorney-client relationship with his law client and his duty only could flow to that client. It also maintains that the type of fiduciary relationship arising out of the Assignment Agreements was not the type of relationship giving rise to a compensable claim before the Fund.

We begin with the Fund's determination that the Assignment Agreements did not create an attorney-client relationship. "What constitutes an attorney-client relationship is a rather elusive concept." *Folly Farms I, Inc. v. Trs. of Clients' Sec. Trust Fund*, 282 Md. 659,

13

670 (1978). In assessing whether an attorney-client relationship has been formed, the Court of Appeals has been guided by a test adopted by many other states:

> An attorney-client relationship is said to have been created when (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

*Attorney Grievance Comm'n v. Brooke*, 374 Md. 155, 174 (2003). The *Brooke* Court also looked to the test set out in section 14 of the *Restatement (Third) of the Law Governing Lawyers*:

> "A relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and . . . (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services . . . ."

374 Md at 174.

In the instant case, there were no manifestations by AAF in the Assignment Agreements that it intended for Schwartz to provide legal services to it. AAF did not seek Schwartz's "advice or assistance" concerning "matters within [his] professional competence." AAF also did not agree to pay Schwartz a legal fee for any services. Rather, each Assignment Agreement provided that AAF would advance money to Schwartz based on his representation that he was entitled to an attorney's fee in a pending case and that he would repay the advanced funds and an additional amount, quite reasonably characterized as interest, at a later date. Each Assignment Agreement also contained numerous provisions

14

granting AAF remedies for a breach by Schwartz. The Fund correctly characterizes these provisions as creating an "adversarial relationship" more typical of a security agreement and not at all characteristic of a legal services agreement. Finally, in response to the Fund's investigation, Schwartz characterized his relationship with AAF as that of a borrower-lender and denied that he ever had represented AAF in a legal capacity. The Fund's determination that the Assignment Agreements did not create an attorney-client relationship was supported by substantial evidence in the record and was legally correct.

The Fund also determined that the Assignment Agreements did not give rise to the type of fiduciary relationship that is "traditional and customary in the practice of law." The Court of Appeals decision in *Advance Finance, Co.*, 337 Md. at 195, supports this conclusion. In that case, Advance Finance ("Advance"), a consumer loan company, loaned money to personal injury claim plaintiffs with the loans being secured by assignments of the expected proceeds of their claims. Two attorneys had arranged for loans to their clients from Advance so the clients could pursue their personal injury claims. The attorneys represented to Advance the expected settlement value of each claim and the requested loan amount. If Advance approved the loan request, the client executed a promissory note, a security agreement, and an "Authorization and Assignment." *Id.* at 198. The latter document authorized and directed the client's attorney to pay Advance directly from the proceeds of any recovery in the personal injury action.

15

Initially, the two attorneys paid Advance as directed. At some point, however, they stopped paying Advance. Ultimately, both attorneys were disbarred. Advance sued them, obtaining default judgments against them, and also pursued claims against the individual clients. Thereafter, Advance made claims with the Fund in each case in which the underlying personal injury case had settled, the proceeds had been remitted to one of the two attorneys, and the attorneys had failed to pay Advance. It sought only the net amount of each loan.

The Fund denied the claims, ruling that the attorneys did not have an attorney-client relationship with Advance and were not fiduciaries for Advance. On appeal from that determination, the Court of Appeals reversed. It explained that Rule 1.15 of the Rules of Professional Conduct required an attorney in possession of client funds belonging to a third party, such as a health insurer or a creditor of the client, to promptly notify the third party and disburse the funds to that third party. Commentary on Rule 1.15 supported the conclusion that the lawyer acted as a fiduciary for the third party while holding the funds on the third party's behalf. The Court also noted that the Fund routinely paid claims to non-client claimants in the context of real estate settlements, where an attorney's defalcation had resulted in the theft of the proceeds of the settlement. Based on these principles, the Court held that the former attorneys who had acted as "intermediaries" for their clients to arrange the loans from Advance were acting as fiduciaries for Advance at such time as they received the settlement proceeds in each underlying personal injury case in which their client had directed them to pay Advance from those proceeds. *Id.* at 205. The Court remanded the

16

claims to the Fund for it to determine, in its discretion, the amount of compensation, if any, to award to Advance.

We return to the case at bar. The facts in *Advance* resemble the facts relative to the Assignment Agreement between Jackson and AAF. Jackson was Schwartz's client. She agreed to assign an interest in an expected estate settlement to AAF in exchange for an advance of $2,500. She directed Schwartz both to accept the $2,500 on her behalf and, upon receiving the proceeds from the estate, pay AAF its assigned interest (plus any penalty) directly from those proceeds. It was under the authority of *Advance* that the Fund determined that Schwartz's failure to pay AAF in compliance with his client's instructions was a defalcation resulting in a loss to AAF at a time when Schwartz was acting as its fiduciary.

The Assignment Agreements between Schwartz and AAF, did not involve a law client, however. Schwartz assigned to AAF *his* interest in the attorneys' fees *he* expected to be paid. His law clients had not directed him to disburse funds to AAF. Thus, in marked contrast to the facts presented in *Advance*, Schwartz's defalcation resulted in his failure to repay a personal obligation to AAF, rather than his failure to disburse funds to satisfy an obligation of his law client. The Fund determined, under these facts, that Schwartz's relationship with AAF was not a fiduciary relationship that is "traditional and customary" in the practice of law and therefore was not a compensable claim upon the Fund. We accord deference to an agency's interpretation of the regulations it promulgates. *See Frey v. Comptroller of the Treasury*, 422 Md. 111, 138 (2011) ("[W]e afford great weight to the

17

agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose."). We perceive no error by the Fund in interpreting its regulation governing eligibility to limit the types of fiduciary relationships giving rise to a compensable claim or in its conclusion that an attorney's direct assignment of a personal interest in an expected fee does not create a fiduciary relationship that is traditional and customary in the practice of law.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**