*Steven J. Grebow v. Client Protection Fund of the Bar of Maryland*, No. 1392, Sept. Term 2020, Opinion by Leahy, J.

**Client Protection Fund of the Bar of Maryland > Claims for Reimbursement**

Although "[n]o claimant or other person has any right in the Fund, as beneficiary or otherwise," Md. Rule 19-609(b)(2), the Trustees may reimburse a "loss that was caused by a defalcation of a lawyer if: <u>(1) the lawyer caused the loss while acting for the person *as an attorney or a fiduciary*</u>; and (2) the person cannot recover the money under a bond," Maryland Code (1989, 2018 Repl. Vol.), Business Occupations and Professions Article, § 10-312(b) (emphasis added); *see also* Md. Rule 19-602(a) ("The purpose of the Client Protection Fund is to maintain the integrity and protect the good name of the legal profession by reimbursing . . . losses caused by defalcations by members of the Bar of Maryland or out-of-state attorneys authorized to practice in this State . . . acting as either attorneys or, except to the extent they are bonded, as fiduciaries.").

**Client Protection Fund of the Bar of Maryland > Claims for Reimbursement > Fiduciary Capacity > Traditional and Customary in the Practice of Law**

We hold that, under the terms of the Escrow Agreement, Mr. Sniffen was not acting in a fiduciary capacity that is "traditional and customary in the practice of law in Maryland." Mr. Sniffen's duties under the Escrow Agreement did not resemble the "intermediary roles" occupied by the defalcating attorneys with regard to the compensable claims in *Advance Finance Co. v. The Trustees of Clients' Security Trust Fund of the Bar of Maryland*, 337 Md. 195 (1995) and *American Asset Finance, LLC. v. Trustees of the Client Protection Fund of the Bar of Maryland*, 216 Md. App. 306 (2014). In addition to bearing no resemblance to the "intermediary capacities" in those cases, Mr. Sniffen's escrow agent duties were also unlike the example fiduciary capacities listed in Rule 19-602(b), all of which involve a fiduciary *interacting with third parties for the benefit of a client*. Here, Mr. Grebow seeks to recover funds that Mr. Sniffen was holding on behalf of a non-client, Mr. Grebow, for the benefit of the same non-client, Mr. Grebow. The Escrow Agreement specified that Mr. Grebow was "the sole beneficiary of the Escrow Account, and neither McCloskey, the Company, nor their respective creditors, [were] acquiring any right, title or interest in the Escrow Funds" and that Mr. Sniffen was not permitted to "withdraw or disburse the Escrow Funds or any portion thereof or allow the withdrawal or disbursement of the Escrow Funds or any portion thereof[.]"

Circuit Court for Baltimore County
Case No. C-03-CV-19-001133

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1392

September Term, 2020

_____

STEVEN J. GREBOW

v.

CLIENT PROTECTION FUND OF THE BAR
OF MARYLAND

_____

Leahy,
Zic,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: June 29, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Client Protection Fund of the Bar of Maryland (the "Fund") was established in 1966 to "maintain the integrity and protect the good name of the legal profession." Md. Rule 19-602(a). The Fund reimburses members of the public for "losses caused by defalcations" by attorneys acting in professional capacities or certain fiduciary capacities that are "traditional and customary in the practice of law in Maryland." Md. Rule 19-602(a) and (b). In this appeal, Steven J. Grebow, appellant, challenges a final decision of the Fund's Trustees denying his claim for reimbursement.

Mr. Grebow's claim arises out of an "Escrow Agreement" that he entered into with the McCloskey Group (the "Company") and its sole member, Mr. Brian McCloskey, on December 11, 2009, during the "Great Recession."[1] The purpose of the Escrow Agreement was to establish that the Company had cash reserves to secure a United States Department of Housing and Urban Development ("HUD") loan for a large development project. In exchange for temporarily depositing several million dollars into the escrow account, Mr. Grebow was to be paid a handsome fee of two million dollars. The Escrow Agreement specified, however, that Mr. Grebow remained "the sole beneficiary of the escrow account" and neither Mr. McCloskey, the Company, nor their creditors acquired "any right, title, or

---

[1] After Lehman Brothers Holdings, Inc. filed for Bankruptcy on September 15, 2008, "the global credit markets went into the financial equivalent of cardiac arrest" and "[c]ommercial lending came to a virtual halt." *In re Charter Commc'ns*, 419 B.R. 221, 232 (Bankr. S.D.N.Y. 2009). This lending lag plagued the Great Recession period. *See* Bureau of Consumer Fin. Prot.*, Data Point: Small Business Lending and the Great Recession*, at 32 (Jan. 2020) ("Small business lending was significantly affected by the Great Recession); Patrick McCarney, Note, *False Start: Carving a Niche Established Small Business Participation in Regulation Crowdfunding Rules Designed for Startups*, 51 Ind. L. Rev. 277, 279 (2018) ("The traditional market for small business lending stagnated after the Great Recession as big banks looked for more profitable loans.").

interest in the Escrow Funds."

The Escrow Account was managed by Mr. Kevin Sniffen, a Maryland attorney, who was obligated to deliver the fee, together with Mr. Grebow's entire deposit, to Mr. Grebow on the date of the settlement of the HUD Loan. Mr. Sniffen never returned the escrow funds to Mr. Grebow as he and Mr. McCloskey had embezzled the money in the perpetration of a complex wire fraud scheme. For his role, Mr. Sniffen was convicted in the United States District Court for the District of Maryland of conspiracy to commit wire fraud, and he was subsequently disbarred by the Maryland Court of Appeals from the practice of law in Maryland.

Mr. Grebow filed a claim for $3,115,000.00 with the Fund in February 2012.[2] The Trustees denied Mr. Grebow's claim in April 2019. They determined, among other things, that Mr. Sniffen, in his capacity as escrow agent, was not acting as an attorney or in a fiduciary capacity that is traditional and customary in the practice of law in Maryland. Mr. Grebow petitioned for judicial review in the Circuit Court for Baltimore County. That court affirmed the decision of the Trustees. Mr. Grebow appeals and presents one question for our review:

> "Did the Fund err in determining pursuant to Maryland Rule 19-602(a) that [Mr.] Sniffen was not 'acting in a fiduciary capacity that is traditional and customary in the practice of law in Maryland' with respect to [Mr.] Grebow's misappropriated funds?"

We hold that Mr. Grebow is not eligible to recover from the Fund because, as the

---

[2] Mr. Grebow amended his claim to $2,616,00.00 on January 30, 2019 to reflect that he had recovered $499,000.00 through other avenues.

2

Trustees correctly decided, Mr. Grebow's dealing with Mr. Sniffen did not rise to an attorney-client relationship and Mr. Sniffen was not acting in a fiduciary capacity that is "traditional and customary in the practice of law in Maryland." Accordingly, we affirm.

## BACKGROUND

### A. The Escrow Agreement

In 2009, the Company was pursuing a loan to fund a large development project in York, Pennsylvania. To bolster the odds of obtaining the loan, Mr. McCloskey, the Company's sole member, asked Mr. Grebow, of Grebow Investments, to temporarily deposit money into an escrow account to supply the Company with "liquidity." Ergo, the Escrow Agreement was drafted by Mr. Grebow's attorney and Mr. Kevin Sniffen, an attorney affiliated with the Company. The parties signed the Escrow Agreement on December 11, 2009, and represented in an opening "Explanatory Statement" that:

> The Company is a single member limited liability company, the sole member of which is McCloskey. The Company is contemplating entering into a loan transaction ("The Loan") as borrower with Eastern Mortgage Capital or HUD (collectively the "Lender"). The Company has represented to Grebow that the Loan is more likely to be consummated if Escrow Agent represents to the Lender that he holds Two Million Two Hundred and Fifty Thousand Dollars ($2,250,000,00) ("the Escrow Funds") in an escrow account. Grebow is willing to deposit the Escrow Funds with Escrow Agent to be held and to remain in an escrow account established by Escrow Agent for the purposes of this Agreement ("the Escrow Account") on the following terms and conditions.

The Escrow Agreement specified that the account was to be a "non-interest bearing depository account at Wachovia Bank[,]" titled "Kevin Sniffen, Escrow Agent[,]" and was to be opened using Mr. Sniffen's employer identification number. It provided that, simultaneously with Mr. Grebow's deposit of $2,250,000.00 into the "Kevin Sniffen,

3

Escrow Agent" account, the Company was obligated to deposit a "fee" in the amount of $500,000.00 into the account, "payable to Grebow in consideration for Grebow's deposit of the Escrow Funds in the Escrow Account." Mr. Grebow earned this fee "immediately upon [his] delivery of the Escrow Funds," and, under section 2 (c) of the Escrow Agreement, Mr. Sniffen was to deliver the fee, together with Mr. Grebow's initial deposit, to Mr. Grebow on "the date of the settlement of the HUD Loan, but not later than March 1, 2010 (the 'Termination Date')." In other words, on the "Termination Date," Mr. Sniffen was to send Mr. Grebow $2,750,000.00 "by wire transfer."

Notwithstanding the Escrow Agreement's provision that it was consummated "solely for the *purpose of satisfying the Company's* closing requirements of that certain loan," Section 1(e) of the Escrow Agreement explained that Mr. Grebow was "the sole beneficiary of the escrow account" and neither Mr. McCloskey, the Company, nor their creditors, acquired "any right, title, or interest in the Escrow Funds." (Emphasis added).

Section 2(a) and (b) of the Escrow Agreement detailed Mr. Sniffen's obligations as Escrow Agent, including his duty to "retain and safeguard the Escrow Funds" and to prohibit any third party, "other than the Lender or Grebow" from "obtaining possession of or an interest in the Escrow Funds." He was not permitted to withdraw money from the escrow account, unless it was for Mr. Grebow's benefit, without the "express joint written consent of Grebow, the Company and McCloskey[.]"

To cover any losses resulting "from the acts or omissions of [Mr. Sniffen], his employees[,] agents[,] and contractors," the Escrow Agreement required that Mr. Sniffen procure a fidelity bond which was "acceptable to Grebow in its sole discretion[.]" If the

4

fidelity bond was cancelled, Mr. Sniffen was required to "immediately return the Escrow Funds to Grebow[.]"

Sections 3 and 4 of the Escrow Agreement contained numerous representations, warranties, and covenants protecting Mr. Grebow's funds. In Section 3, Mr. McCloskey and his company agreed that they would not settle on the subject loan "unless there are sufficient excess proceeds in the Loan to fund all escrows and interest reserves required by the Lender[.]" Further, Mr. McCloskey warranted that the Company would close on the loan only "upon the consent of Grebow." For his part, Mr. Sniffen warranted that he was "an attorney admitted to practice in the State of Maryland and [was] fully competent to perform his duties pursuant to [the] Agreement." He further warranted that any representation he made to the "Lender [HUD] . . . regarding the Escrow Funds" would be "truthful, lawful and not in the perpetuation of a fraudulent transaction."

The Escrow Agreement, which was scheduled to terminate no later than March 1, 2010, was amended nine times to extend the Termination Date. During the course of the nine amendments, Mr. Grebow made two additional deposits into the escrow account: the first, in the amount of $1,300,000.00, was made on May 11, 2010; and the second, for $290,000.00, was made on February 4, 2011.

In exchange for the additional deposits and extensions, Mr. McCloskey increased Mr. Grebow's fee to $2,000,000.00 under the Ninth Amendment. This final amendment extended the Termination Date to April 15, 2011—just over sixteen months after the original Agreement was signed. During the course of the escrow arrangement, Mr. Grebow

5

also received a total of $725,000.00 through various "Return from Escrow" payments, leaving Mr. Grebow's net deposit into the escrow account at $3,115,000.00.

## B. The Criminal and Civil Fraud Cases

In August 2011, Mr. Grebow's attorney received a copy of a civil complaint alleging that Mr. McCloskey and Mr. Sniffen had embezzled escrow funds and used the money as part of a large wire fraud scheme.[3] A year later, Mr. Sniffen was disbarred from the practice of law in Maryland for his participation in the scheme. *See Att'y Grievance Comm'n v. Sniffen*, 427 Md. 521 (2012). He pleaded guilty to one count of conspiracy to commit wire fraud in the United States District Court and, in January 2015, was sentenced to 36 months imprisonment, followed by three years of supervised probation upon his release. *See* Second Amended Judgment, *United States v. Sniffen*, No. 1:12-cr-00127-JFM (D. Md. Jan. 21, 2015). At his sentencing, Mr. Sniffen was ordered to pay $15,850,000.00 in restitution, $3,115,000.000 of which was designated for Mr. Grebow.[4]

## C. Client Protection Fund Claim

In February 2012, Mr. Grebow filed the underlying "Statement of Claim" against Mr. Sniffen with the Fund. On the "CPF Claim 2528" form, Mr. Grebow alleged that,

---

[3] The complaint was filed by Repid, LLC and Namkeb, LLC in the Circuit Court for Baltimore County and was assigned Case No. 03-C-11-007986. Both companies alleged that they entered into escrow agreements with Mr. Sniffen serving as the escrow agent and were ultimately defrauded.

[4] Meanwhile, back in September of 2011, Grebow Investments, LLC joined Repid, LLC and Namkeb, LLC in their litigation in the Circuit Court for Baltimore County against Mr. Sniffen, Patrick Belzner, Mr. McCloskey, and various companies owned by Mr. McCloskey. In response to this lawsuit, and a variety of other similar lawsuits, on

(Continued)

6

between December 2009 and February 2011, Mr. Sniffen, while acting "as a fiduciary with respect to an escrow account," had taken $3,115,000.00.

The Trustees of the Fund denied Mr. Grebow's claim during their May 2018 meeting. Mr. Grebow moved for reconsideration and, on January 30, 2019, the Trustees held a hearing on the record. At the hearing's outset, Mr. Grebow orally amended his claim from $3,115,000.00 to $2,616,000.00, as he had received $499,000.00 in restitution and other legal proceedings since he originally filed his claim with the Fund.

Mr. Grebow testified that the purpose of the Escrow Agreement was to prove the liquidity of Mr. McCloskey's company. Proving liquidity, Mr. Grebow explained, "happens . . . frequently" in the real estate business because the "lender wants to see that there is access to equity or cash." He explained that, in this case, "the bank wanted to see that [McCloskey] would be able to do the project and that there was cash standing by." More specifically, "there was going to be a 4 million dollars of liquidity that came when the bank initially settled the loan." He explained that, because the Company did not have cash on hand, he agreed to post liquidity in an escrow account, which "would never leave the account" and allow Mr. Sniffen, as escrow agent, to "make certain limited representations to the bank." In exchange for posting this liquidity, Mr. Grebow was to

December 3, 2012, the circuit court appointed a receiver to identify Mr. Sniffen's stolen or misappropriated funds and to distribute his estate. Mr. Grebow was awarded a pro rata share of the receivership estate based on his net loss and received distributions of $326,615.40 and $20,786.33 on July 31, 2019 and December 16, 2020. The circuit court granted the receiver's motion to terminate the receivership on December 16, 2020, and the civil case was dismissed on December 23, 2021 for "[l]ack of [p]rosecution."

7

receive, when the loan settled, his "money back plus a fee that the developer was going to pay."

Mr. Grebow maintained that he "exercised such caution" in drafting the Escrow Agreement to ensure that Mr. Sniffen could not falsely represent that the Escrow Funds were owned by Mr. McCloskey's company. He noted, for example, that to avoid false characterizations, the Escrow Agreement required that he approve any representation made by Mr. Sniffen, to the Lender or otherwise, about the escrow funds.

Mr. Grebow also detailed the steps that he took to ensure that his money was protected in the escrow account. He explained that he and his attorney made sure to clarify that the money in the escrow account was *his* money. They also did "a bunch" of research on Mr. Sniffen to "see if [he] steals money." This research, he asserted, revealed that Mr. Sniffen was "an attorney practicing pretty much with an unblemished record for 25 years." Had Mr. Sniffen not been a licensed attorney, Mr. Grebow asserted that he would "[n]ever in a million years" have given him the money.

In Mr. Grebow's view, he was entitled to compensation from the Fund as Mr. Sniffen, in his capacity as a lawyer and an escrow agent, was a fiduciary. Mr. Grebow's attorney similarly argued that, "[b]ut for the fact that Mr. Sniffen was an attorney, this deal would not have happened." As an escrow agent, counsel asserted, Mr. Sniffen was a "fiduciary" and that "to protect the integrity of the legal profession" the Trustees should "pay this claim."

The Trustees issued a final decision denying Mr. Grebow's claim on April 12, 2019. The Trustees concluded that Mr. Grebow transferred the funds to "Sniffen's escrow

8

account for the sole purpose of allowing McCloskey to falsely represent to [the Lender] that McCloskey had 'liquid funds' in escrow to satisfy McCloskey's closing requirements for a loan[.]" The Trustees noted that the escrow money was, at all times, to remain Mr. Grebow's and that "neither McCloskey, nor his entity, nor any of either's creditors were to acquire any right, title or interest in the Money[.]" They concluded that the purpose of the Escrow Agreement was to make the Lender believe that "McCloskey had 'liquid funds' in escrow to satisfy McCloskey's closing requirements for a loan in the amount of $27,984,000"—a fact that "McCloskey, Sniffen, and Grebow knew was false." Therefore, the Trustees characterized Mr. Grebow's relationship with Mr. Sniffen and Mr. McCloskey as that of "either a business partner[], a lender to, or co-conspirator[.]"

The services rendered by Mr. Sniffen in connection with the escrow arrangement were, in the Trustees' opinion, "utterly insufficient" to establish an attorney-client relationship between himself and Mr. Grebow. They concluded that in his capacity as an escrow agent, Mr. Sniffen was "not ask[ed] to, and did not perform, legal services." Specifically, the Trustees found that throughout the duration of the escrow arrangement, Mr. Sniffen was "not asked to and did not give any legal advice, perform any legal research or write any document, and he did not use any legal knowledge or skill in order to apply legal principles and precedent." By the terms of the Escrow Agreement, the Trustees reasoned, Mr. Sniffen "merely" was tasked with holding the escrow funds "in his escrow account as part of the scheme to show the Lender that McCloskey had the financial wherewithal to complete the development project." Simply holding funds, "without any

9

indication of the rendition of legal services or connection to any legal matter being handled by Sniffen" did not, in the Trustees' opinion, establish an attorney-client relationship.

Mr. Sniffen's escrow agent duties also did not, in the Trustees' view, resemble a fiduciary capacity that is traditional and customary in the practice of law in Maryland. Mr. Sniffen, the Trustees concluded, was "not acting as a personal representative, or a trustee, a guardian, a custodian, or as the holder of power." Rather, he was "*appearing* to create an asset of a prospective borrower with a loan from a prospective lender," which, in the Trustees' opinion, was not a fiduciary capacity that is "traditional and customary in the practice of law." Because Mr. Grebow and Mr. Sniffen were not engaged in an attorney-client relationship or a fiduciary relationship that was traditional and customary in the practice of law in Maryland, the Trustees determined that his claim was not reimbursable from the Fund.

The Trustees also reasoned that the doctrine of "unclean hands" barred Mr. Grebow's claim.[5] They found that his hearing testimony "was not credible" and that he "knew or should have known [that he] was participating in a scheme with Sniffen to misrepresent the assets of McCloskey to the Lender for the purposes of obtaining the Loan." The Trustees concluded that Mr. Grebow—"a very experienced lender in development projects according to his testimony—turned a blind eye to the true nature of

---

[5] The Trustees cited this Court's opinion in *Mona v. Mona Electric Group*, 176 Md. App. 672, 714 (2007), in which we noted that the "equitable doctrine of unclean hands is designed to prevent the court from assisting in fraud or other inequitable conduct. It is available to deny relief to those guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought." (cleaned up).

10

the arrangement." In their view, the Escrow Funds could not represent the liquidity of Mr. McCloskey or the Company as the funds remained, at all times, Mr. Grebow's. Mr. Grebow's claim was, therefore, not compensable, as he was seeking to recover the "very money" that he had used "in a scheme to misrepresent assets."[6]

The Trustees concluded by observing that, to recover from the Fund, a claimant "bears the dual burdens of production and persuasion on the question of whether the [c]laim meets the eligibility requirements for reimbursement." Because Mr. Grebow failed to meet those burdens, the Trustees denied his claim.

### D. Petition for Judicial Review

Mr. Grebow filed a petition for judicial review in the Circuit Court for Baltimore County on April 25, 2019. He challenged the Trustees' finding that Mr. Sniffen was not "'acting in a fiduciary capacity that is traditional and customary in the practice of law in Maryland' with respect to [Mr. Grebow's] funds." In his view, the Fund "clearly premised its denial of [the] [c]laim on the mistaken conclusion that [he] was complicit in Sniffen's scheme." There was no evidence in the record, he averred, "on which to base the Fund's self-serving conclusion that [he] was involved in the scheme to defraud with respect to the escrowed funds that Sniffen ultimately embezzled." To the contrary, he asserted that the

---

[6] In a footnote, the Trustees also noted that the Fund's regulations provided several additional bases supporting their denial of Mr. Grebow's claim. First, they noted that the "fundamental purposes of the Fund do not include the reimbursement of investors [or] . . . the guaranty of profit-making such as with small loan companies or similar enterprises." Next, the Trustees observed that claimants in a close relationship with the attorney, such as "a spouse, a law partner, or conspirator," are not eligible for reimbursement from the Fund. The Trustees asserted that "[t]he Fund is not, and will not act as, a collection agency for all claims against Maryland lawyers."

Circuit Court for Baltimore County and the United States District Court for the District of Maryland found that Mr. Grebow was a "***victim*** of Sniffen's fraud." (Emphasis in original).

In their answering memorandum filed on September 30, 2020, the Trustees asserted that their decision to deny Mr. Grebow's claim was not arbitrary or capricious and was supported by substantial evidence. They proffered "alternate reasons, either of which," they averred, was "sufficient for [the circuit court] to affirm" their decision. First, they asserted that Mr. Grebow "was not in the required fiduciary relationship" with Mr. Sniffen. In the Trustees' view, Mr. Sniffen's duties and responsibilities under the Escrow Agreement did not resemble a fiduciary capacity that is "traditional and customary in the practice of law." While "Sniffen was certainly [Mr. Grebow's] general fiduciary, and certainly . . . answerable to [Mr. Grebow] on any number of theories," the Trustees asserted that Mr. Grebow and Mr. Sniffen "were not in the required, special, fiduciary relationship necessary for reimbursement from the Fund."

Second, even if Mr. Sniffen was acting in one of the requisite relationships, the Trustees argued that they were within their discretion to deny Mr. Grebow's claim. The Trustees, after asserting that Maryland Rule 19-609(c)(7) grants them the discretion to consider "any other factor [they] deem appropriate," argued that the Escrow Agreement and Mr. Grebow's testimony led to their conclusion that Mr. Grebow "knew or should have known [that he] was participating in a scheme with Sniffen to misrepresent the assets of McCloskey to the Lender[.]"

After conducting a virtual hearing in December 2020, the circuit court issued a memorandum opinion and ruling in which it concluded that Mr. Grebow was not entitled

12

to recovery from the Fund. The court reasoned that under the Escrow Agreement Mr. Sniffen was tasked, simply, with holding "money for the benefit of McCloskey's business endeavors." It found no error with the Fund's determination that these duties did not rise to the level of an attorney-client relationship or a fiduciary relationship that is traditional and customary in the practice of law in Maryland. Consequently, the court affirmed the decision of the Fund. Mr. Grebow noted a timely appeal on February 10, 2021.

## STANDARD OF REVIEW

It is well established that on appeal from the judgment of the circuit court on judicial review of an agency decision, we "look through" the decision of the circuit court and review the agency's decision directly. *Am. Asset Fin., LLC v. Trs. of Client Prot. Fund of Md.*, 216 Md. App. 306, 315 (2014) (collecting cases). The standard that we apply in reviewing a final decision of the Trustees is spelled out in Maryland Rule 19-610(b):

> [T]he decision of the trustees shall be deemed prima facia correct and shall be affirmed unless the decision was arbitrary, capricious, unsupported by substantial evidence on the record considered as a whole, beyond the authority vested in the trustees, made upon unlawful procedure, or unconstitutional or otherwise illegal.

In applying this standard, we defer to the Trustees' fact-finding as well as the inferences that the Trustees drew from those facts, so long as there is evidence in the record that can support those findings and inferences. *Am. Asset Fin., LLC*, 216 Md. App. at 316. In other words, we view the agency's decision "in the light most favorable to the agency," *Mayor of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 667 (2021), and our review is "limited to determining whether 'there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is

13

premised upon an erroneous conclusion of law,'" *Cherington Condo. v. Kenney*, 254 Md. App. 261, 278 (2022) (quoting *Md. Real Estate Comm'n v. Garceau*, 234 Md. App. 324, 349 (2017)). We are under "no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *ProVen Mgmt., Inc.*, 472 Md. at 667 (2021) (quoting *People's Couns. v. Md. Marine Mfg. Co.*, 316 Md. 491, 497 (1989)).

## DISCUSSION

### A.      The History and Framework of the Client Protection Fund

To provide context for the parties' arguments and our analysis, we begin with an overview of the purpose of the Client Protection Fund and the laws by which it is governed. The Fund began to take shape in 1965 after the Maryland State Bar Association unanimously approved a proposal to establish a client protection fund. *Folly Farm I, Inc. v. Trs. of the Clients' Sec. Trust Fund of the Bar of Md.*, 282 Md. 659, 662 (1978). The discussions which transpired within the Bar Association before the proposal was approved

> make it clear that the members <u>understood the Fund would not, and could not, cover all losses an attorney might cause</u> . . . . The members were, however, anxious not only to offer protection against a lawyer's embezzlement of his clients funds, but also to ensure that a person for whom an attorney was acting as a fiduciary would be entitled to claim against the Fund for a loss resulting from defalcation by the attorney, even though an attorney-client relationship did not exist between the claimant and the attorney.

*Monumental Life Ins. Co. v. Trs. of Clients' Sec. Trust Fund of the Bar of Md.*, 332 Md. 442, 447 (1991) (emphasis added). Thereafter, the General Assembly enacted Chapter 779 of the Acts of 1965, which authorized the Court of Appeals to "promulgate rules and regulations for the creation and operation of" a client protection fund. *Folly Farm I, Inc.*,

14

282 Md. at 662. "The Fund became fully operative on July 1, 1966, when the [T]rustees began to collect assessments." *Id.*

Under Maryland Code (1989, 2018 Repl. Vol.), Business Occupations and Professions Article ("BOP"), § 10-311(c), as a condition precedent to practicing law in Maryland, lawyers are required to pay an annual fee into the Client Protection Fund, which operates as a trust. The Fund's purpose is to "maintain the integrity of the legal profession by paying money to reimburse losses caused by defalcations of lawyers." *Id.* at (b); Md. Rule 19-602. It is managed by nine trustees who are appointed by the Court of Appeals. BOP § 10-310(a)(2); Md. Rule 19-603(a). The Trustees are responsible for, among other things, "(1) receiv[ing] contributions to the Fund; and (2) manag[ing] the assets of the Fund." BOP § 10-312(a).

Although "[n]o claimant or other person has any right in the Fund, as beneficiary or otherwise," Md. Rule 19-609(b)(2), the Trustees may reimburse a "loss that was caused by a defalcation of a lawyer if: (1) the lawyer caused the loss while acting for the person *as an attorney at law or a fiduciary*; and (2) the person cannot recover the money under a bond," BOP § 10-312(b) (emphasis added); *see also* Md. Rule 19-602(a) ("The purpose of the Client Protection Fund is to maintain the integrity and protect the good name of the legal profession by reimbursing . . . losses caused by defalcations by members of the Bar of Maryland or out-of-state attorneys authorized to practice in this State . . . acting as either attorneys or, except to the extent they are bonded, as fiduciaries."). The Maryland Rules further clarify that, for a claimant to be eligible to recover from the Fund, a defalcating attorney acting as a fiduciary must have been acting in a fiduciary capacity that is

15

"*traditional and customary in the practice of law in Maryland*[.]"  Md. Rule 19-602(b) (emphasis added).

If the Trustees make the threshold determination that a claim does qualify for reimbursement, they must proceed to determine "the amount of such reimbursement; [] the time, place, and manner of payment; [] any conditions upon which payment will be made; and [] the order in which payments will be made."  Md. Rule 19-609(b).  In rendering these decisions, the Trustees may consider:

> (1) The amounts available and likely to become available to the Fund for the payment of claims;
> (2) The amount and number of claims likely to be presented in the future;
> (3) The total amount of losses caused by defalcations of any one attorney or associated group of attorneys;
> (4) The unreimbursed amounts of claims recognized by the trustees in the past as meriting reimbursement, but for which reimbursement has not been made in the total amount of the loss sustained;
> (5) The amount of the claimant's loss as compared with the amount of the losses sustained by other claimants who may merit reimbursement from the Fund;
> (6) The degree of hardship the claimant has suffered by the loss; and
> (7) *Any other factor the trustees deem appropriate.*

Md. Rule 19-609(c) (emphasis added).

### B.  The Parties' Contentions

Mr. Grebow contends that the Trustees' decision lacks both legal and factual support.  Specifically, Mr. Grebow asserts that the Trustees erred as a matter of law when they determined that, under the terms of the Escrow Agreement, Mr. Sniffen was not acting "in a fiduciary capacity that is traditional and customary in the practice of law in Maryland."  In his view, this decision lacked legal support because the Trustees "cite no legal authority for the denial other than Rule 19-602 itself."  Mr. Sniffen's role was

16

"traditional and customary" in the practice of law in Maryland, according to Mr. Grebow, as Maryland law imposed specific duties on lawyers who are depositing "Trust Money in Interest Bearing Accounts." Mr. Grebow avers that his deposits into Mr. Sniffen's escrow account were "tantamount to an express trust," as he deposited his funds into Mr. Sniffen's "attorney escrow account" and expected him to hold the Funds "pursuant to the terms of the Escrow Agreement." In support of his contention, he highlights that Mr. Sniffen was "disbarred from the practice of law 'for the unauthorized use of *trust* funds[.]'" Citing *Advance Finance Co., Inc. v. The Trustees of the Clients' Security Trust Fund of the Bar of Maryland,* 337 Md. 195 (1995), he argues that "a lawyer's duty to safeguard funds and property extends not just to clients, but also to third parties like Grebow." From there, he asserts that "the fact that Sniffen was acting merely as an escrow agent and was not rendering legal services in connection with the underlying real estate development project does not alter or diminish his fiduciary duty under Maryland law[.]"

Mr. Grebow insists that the Fund's determination that he "somehow participated in [Mr.] Sniffen's illegal conspiracy" is unsupported by substantial evidence in the record. He remonstrates that the Trustees were "clearly biased" and demonstrated this by characterizing Mr. Grebow as a "co-conspirator" with Mr. McCloskey, despite Mr. Grebow's award of restitution "in the total amount of his loss" in the United States District Court for the District of Maryland. Additionally, in his view, the Trustees' determination that the Escrow Agreement was consummated for the purpose "of *appearing* to create an asset of a prospective borrower for use in connection with a loan from a prospective lender" disregarded "the express and undisputed language of the Escrow Agreement."

17

The Trustees maintain that they were "legally correct" in determining that Mr. Grebow's claim with the Fund was "not reimbursable" because Mr. Sniffen and Mr. Grebow were not "in a fiduciary relationship . . . that was traditional and customary to the practice of law." The terms of the Escrow Agreement, they argue, establish that the "activity" was "between just two people"—Mr. Grebow and Mr. Sniffen. They highlight that, under the terms of the Agreement, Mr. Sniffen "could only return the Escrow Funds to [Mr.] Grebow, and that he could not distribute any of the Escrow Funds to any other person or entity—*not even the Lender in the event of a loan default.*" (Emphasis in original). According to the Trustees, Mr. Grebow "could not deliver a credible, meaningful answer" regarding the "purpose of putting this money into Sniffen's escrow account" "other than to testify that the purpose was 'proof of liquidity.'"

Considering the terms of the Escrow Agreement, together with its alleged purpose, the Trustees posit that "it was reasonable for [them] to infer . . . that [Mr. Grebow's] deposits with [Mr.] Sniffen were intended to create the false appearance of [Mr.] McCloskey's liquidity to be relied upon by his prospective lender in order to enhance the consummation of the loan." Therefore, citing to *American Asset Finance, LLC v. Trustees of the Client Protection Fund of the Bar of Maryland*, 216 Md. App. 306 (2014), the Trustees argue that Mr. Sniffen was not acting as a "*special* fiduciary as contemplated by [Maryland Rule] 19-602(b)."

Even if Mr. Sniffen and Mr. Grebow had established the requisite fiduciary relationship, the Trustees persist, the doctrine of unclean hands bars Mr. Grebow's reimbursement from the Fund. Given that Mr. Grebow was, by his own admission, a "very

18

experienced lender in development projects," the Trustees contend that he knew the Escrow Agreement could not show Mr. McCloskey's liquidity "because the Escrow Funds remained, at all times, [Mr. Grebow's] funds." They aver that they were within their discretion to consider the fact that Mr. Grebow, "deliberately or otherwise . . . turned a blind eye to the true nature of the [escrow] arrangement" and that this conduct "weights against" reimbursement from the Fund.

### C.    Analysis

Neither Mr. Grebow nor the Trustees argue that Mr. Sniffen and Mr. Grebow were engaged in an attorney-client relationship. Accordingly, we concentrate our analysis on the Trustees' determination that Mr. Sniffen was not acting as "an attorney . . . in a fiduciary capacity that is traditional and customary in the practice of law in Maryland[.]" Md. Rule 19-602(b). We begin with two cases that delimit the fiduciary capacities that qualify under the Rule.

### i.    Prior Case Law

In *Advance Finance Co. v. The Trustees of the Clients' Security Trust Fund of the Bar of Maryland*, the Court of Appeals addressed whether an attorney acts as a fiduciary for a non-client when the attorney, at a client's instruction, "disburses client funds from the attorney's trust account to [the] non-client." 337 Md. 195, 208 (1995). Advance Finance was in the consumer lending business and made "loans to personal injury claim plaintiffs secured by assignments of any proceeds of the injury claims." *Id.* at 197. Before a loan was made, the plaintiff's attorney had to submit certain information, including the estimated value of the lawsuit, to Advance Finance. *Id.* If Advance Finance approved the

19

loan request, the client was required to sign, among other things, an "Authorization and Assignment," which authorized the client's attorney to pay Advance Finance with the proceeds of any personal injury recovery. *Id.* at 198-99.

A lawsuit arose after two Maryland attorneys, who had facilitated "at least seventy-seven" loans for their clients with Advance Finance, ceased remitting the personal injury funds to Advance Finance as contemplated by the "Authorization and Assignment" form. *Id.* at 199. After obtaining default judgments against the attorneys, Advance Finance filed a claim with the Fund seeking reimbursement "for the net balances of the loans" made to the attorneys' clients. *Id.* The Fund denied the claims on the ground that Advance Finance and the attorneys "did not have an attorney-client relationship . . . and that [the attorneys] were not fiduciaries for Advance [Finance]." *Id.* The Court of Appeals reversed.

The Court explained that Rule 1.15 of the Rules of Professional Conduct requires that attorneys in possession of client funds belonging to a non-client third party must promptly notify and disburse the funds to the non-client third party. *Id.* at 204-06. With this obligation in mind, the Court noted that the Fund frequently paid out claims involving non-clients, including "'[t]hefts of real estate proceeds or related escrows,' '[t]hefts of estate and fiduciary moneys,' and '[t]hefts of accident/injury settlement proceeds, and related escrows[.]'" *Id.* at 210. In the personal injury context, the Court acknowledged that the Fund had previously "issued joint payee checks to the client and an unpaid health care provider of the client." *Id.* The Court saw "little difference" between these compensable non-client claims and the claims submitted by Advance Finance. *Id.* at 210. Based on these principles, the Court determined that the former attorneys, who acted as

20

"intermediaries" between Advance Finance and their clients when they coordinated and participated in the loan approval process, were fiduciaries for Advance Finance when they received the settlement proceeds belonging to Advance Finance for their client's personal injury cases. *Id.* Therefore, the Court remanded the case to the Fund to determine whether Advance Finance was entitled to compensation, and if so, in what amounts. *Id.* at 211.

We considered a similar issue in *American Asset Finance, LLC. v. Trustees of the Client Protection Fund of the Bar of Maryland*, 216 Md. App. 306 (2014). Much like Advance Finance, American Asset Finance ("AAF") was in the business of loaning attorneys and their clients' money in exchange for an interest in prospective settlements or estates. *Id.* at 308. AAF entered into four agreements with Mr. Schwartz, a Maryland attorney, who, under the terms of each agreement, assigned AAF an interest in his prospective attorney's fees in exchange for a lump-sum cash payment. *Id.* AAF also entered into a fifth agreement with one of Mr. Schwartz's law clients, who assigned to AAF a prospective interest in an estate. *Id.* That agreement authorized Mr. Schwartz to accept delivery of AAF's interest and to "remit it to AAF immediately on receipt in accordance with [AAF's] instructions." *Id.* at 310. Mr. Schwartz failed to remit any of the funds as contemplated by the agreements. *Id.* at 311.

After Mr. Schwartz was "disbarred by consent from the practice of law in Maryland based upon his having misappropriated funds deposited in his IOLTA account," [7] AAF

---

[7] IOLTA is shorthand for an Interest on Lawyer Trust Account and "means interest on attorney trust accounts payable to the Maryland Legal Services Corporation Fund[.]" Md. Rule 19-402(h).

filed claims for reimbursement with the Fund. *Id.* In its final determination, the Fund denied all four claims relating to the interest assigned in the attorney's fees. *Id.* at 313. Although the Fund noted that there were "several grounds upon which the Trustees could deny the Claims," the Fund's decision was "based solely upon its conclusion that AAF did not have standing 'to make a claim with the Fund because of a lack of attorney-client or fiduciary relationship with [the attorney].'" *Id.*

The Fund decided there was no attorney-client relationship, noting that the "only legal service Schwartz was to provide to [AAF] was the collection and disbursement of the settlement and estate proceeds from the cases in which Schwartz was the attorney." *Id.* In finding that the requisite fiduciary relationship did not exist, the Fund explained that it "looked to the 'real relationship' between AAF and [the attorney]" and concluded that it was not "traditional and customary in the practice of law." *Id.* at 314.

Conversely, the Fund granted in part the sub-claim arising from the agreement with the attorney's client. *Id.* at 312. Because the law client had authorized the attorney to accept her settlement and pay AAF its share, the Fund determined that under *Advance Finance*, the attorney and AAF "had a fiduciary relationship giving rise to a compensable claim." *Id.* at 312. After a circuit court affirmed the decision of the Fund, AAF appealed to this Court. *Id.* at 315.

At the time that AAF appealed, the Maryland Rules did not limit the scope of fiduciary relationships that were eligible for recovery from the Fund. However, the Fund did have an "Eligibility" regulation, which clarified that a "'fiduciary relationship' means, for example, a lawyer acting in a fiduciary capacity traditional and customary in the

22

practice of law in Maryland." *Id.* at 317 (quoting the Regulations of the Client Protection Fund). Analogizing to the agreement in *Advance Finance*, we reasoned that the agreement with Mr. Schwartz's law client was compensable, as the law client had authorized Mr. Schwartz to accept her settlement and to pay a third-party, AAF, its assigned share. *Id.* Because Mr. Schwartz's defalcation resulted from his role as an intermediary between his law client and AAF, we concluded that AAF was eligible to recover, as the attorney's fiduciary role was "traditional and customary in the practice of law in Maryland." *Id.*

We also affirmed the Fund's decision denying AAF's claims related to Mr. Schwartz's prospective attorney's fees. *Id.* at 321-22. We noted that, "in marked contrast to the facts presented in *Advance Finance*," the agreement between the attorney and AAF "did not involve a law client" and, therefore, the attorney's "defalcation resulted in his failure to repay a personal obligation to AAF, rather than his failure to disburse funds to satisfy an obligation of his law client." *Id.* at 321 (emphasis added). Under these agreements, Mr. Schwartz was not acting on behalf of a law client and, consequently, was not acting as an intermediary between a client and third-party. In fact, Mr. Schwartz was not acting as an intermediary at all, as the agreements involved only himself and AAF. *Id.* at 321. Under these facts, and according the requisite deference to the Fund's interpretation of its own regulation, we determined that the Fund did not err in concluding that "an attorney's direct assignment of a personal interest in an expected fee does not create a fiduciary relationship that is traditional and customary in the practice of law." *Id.* at 321-22.

23

## ii. Adoption of Title 19, Chapter 6 of the Maryland Rules

The Court of Appeals has the constitutional duty to "adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law." Md. Const. art. IV, § 18(a). Because the Maryland Rules carry the weight of law, a court's interpretation of them is a matter of law, to be conducted under a de novo standard of review. *Xu v. Mayor of Balt.*, 254 Md. App. 205, 211 (2022).

The Court of Appeals, in 2016, adopted Rule 19-602 which incorporated part of the Fund's regulation governing "Eligibility." Similar to the regulation, the Rule limits the scope of eligible claimants to those who sustained "losses caused by defalcations by members of the Bar of Maryland or out-of-state attorneys . . . acting either as attorneys or, except to the extent they are bonded, as fiduciaries." Md. Rule 19-602(a). The Rule also incorporates the regulation's definition of a "fiduciary," and provides that, to be eligible to recover from the Fund, the fiduciary must have been "an attorney acting in a fiduciary capacity that is traditional and customary in the practice of law in Maryland." Md. Rule 19-602(b). By way of illustration, the Rule provides a non-exhaustive list of fiduciary roles that are "traditional and customary in the practice of law in Maryland": (1) "personal representative of a probate estate"; (2) "trustee of an express trust"; (3) "a guardian"; (4) "a custodian acting pursuant to statute"; or (5) "an attorney-in-fact by written appointment." *Id.*

### iii. Mr. Sniffen's Capacity Under the Escrow Agreement

Mr. Sniffen's duties under the Escrow Agreement did not resemble the "intermediary roles" occupied by the defalcating attorneys with regard to the compensable claims in *Advance Finance* and *American Asset Finance*. However, unlike the compensable claims in those cases, whereby the attorneys possessed client funds belonging to non-client third parties—here, Mr. Grebow seeks to recover funds that Mr. Sniffen was holding on behalf of a non-client, Mr. Grebow, for the benefit of the same non-client, Mr. Grebow.[8] The Escrow Agreement specified that Mr. Grebow was "the sole beneficiary of the Escrow Account, and neither McCloskey, the Company, nor their respective creditors, [were] acquiring any right, title or interest in the Escrow Funds"[9] and that Mr. Sniffen was not permitted to "withdraw or disburse the Escrow Funds or any portion thereof or allow the withdrawal or disbursement of the Escrow Funds or any portion thereof[.]" Mr. Sniffen was clearly not acting as a "mediator or go-between" as the attorney with regard to the compensable claim with the law client in *American Asset Finance.*

In addition to bearing no resemblance to the "intermediary capacities" in *Advance Finance* and *American Asset Finance*, Mr. Sniffen's escrow agent duties also did not resemble the example fiduciary capacities listed in Rule 19-602(b), all of which involve a

---

[8] Mr. Grebow does not seek to recover the two-million-dollar fee that he was owed under the Ninth Amendment to the Escrow Agreement.

[9] We note that this provision conflicts with the "Escrow Agent's Responsibilities" section, which provides, in relevant part, that the Escrow Agent "shall not allow any third party, other than *the Lender* or Grebow, to obtain possession of or an interest in the Escrow Funds[.]" (Emphasis added).

fiduciary *interacting with third parties for the benefit of a client*. Under the terms of the Escrow Agreement, Mr. Sniffen was tasked, simply, with "promptly establish[ing] a . . . depository account at Wachovia Bank" where he would house Mr. Grebow's deposits until he was instructed to return the escrow funds directly to Mr. Grebow. Mr. Grebow testified that Mr. Sniffen was simply holding his money, without any possibility that it would be otherwise disbursed, as he agreed that under the Escrow Agreement he was to receive "$500,000 for four months of parking [his] money in Mr. Sniffen's escrow account."

In further contrast to the compensable claims in *Advance Finance* and *American Asset Finance*, Mr. Sniffen's duties as escrow agent were not adjacent to any legal services that he was providing to either Mr. Grebow or Mr. McCloskey.[10] The terms of the Escrow

---

[10] The type of bank account contemplated by the Escrow Agreement underscores that Mr. Sniffen's role certainly was not "traditional and customary in the practice of law in Maryland." Section 1(b) of the Agreement requires that Mr. Sniffen "promptly establish the Escrow Account" which was to be a "non-interest bearing depository account at Wachovia Bank" titled "Kevin Sniffen, Escrow Agent." This account plainly would not qualify as an attorney trust account under the Business Occupations and Professions Article of the Maryland Code and the Maryland Rules.

Generally, attorneys who are handling funds "from a client or third person to be delivered in whole or in part to a client or third person" must deposit the funds "in an attorney trust account in an approved financial institution." Md. Rule 19-404; BOP § 10-302. To establish an attorney trust account, the attorney must, in writing:

> (a) Request[] the financial institution to designate the account as an attorney trust account, and
>
> (b) Authorize[] the financial institution to report to Bar Counsel any dishonored instruments or overdrafts in the account as required by the agreement under Rule 19-411 between the institution and the Commission.

Md. Rule 19-405. Additionally, an attorney trust account must be named in a way that "distinguish[es] the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm." Md. Rule 19-406.

(Continued)

26

Agreement were clear that the entire agreement was consummated "solely for the purpose of satisfying [Mr. McCloskey's] closing requirements of that certain loan[.]" While all five of the "Escrow Agent Responsibilities" required that Mr. Sniffen safeguard the escrow funds for Mr. Grebow's benefit, there was no mention in the Escrow Agreement of any legal services that Mr. Sniffen was required to perform. It is undisputed that Mr. Grebow was not a law client of Mr. Sniffen, as Mr. Grebow was separately represented throughout the pendency of the Escrow Agreement by Barry Weiskopf, Esquire.[11]

Under the terms of the Escrow Agreement, Mr. Sniffen's role was limited to creating an escrow bank account, which did not qualify as an attorney trust account, and holding the escrowed funds of Mr. Grebow, a non-client, for investment purposes, until he was instructed to return the funds *back* to Mr. Grebow. This relationship does not resemble the "intermediary" capacities recognized in *Advance Finance* and *American Asset Finance* or the fiduciary capacities listed in Rule 19-602(b).

For all these reasons, we hold that, under the terms of the Escrow Agreement, Mr. Sniffen was not acting in a fiduciary capacity that is "traditional and customary in the

---

Here, the Escrow Agreement did not specify that Mr. Sniffen was to house the money in an attorney trust account. In fact, Mr. Grebow's escrow money was deposited and housed in Mr. Sniffen's "Comm Checking" account and not his registered "IOLTA" attorney trust account. Mr. Sniffen's "Comm Checking" account statements show that the account was used for non-legal services, as the statements reflect several entries relating to "McCloskey's subcontractors and suppliers" and "McCloskey's operations."

[11] We also note that, because Mr. Sniffen was not rendering any legal services in connection with the Escrow Agreement or for Mr. Grebow, Maryland Rule 19-301.15, Safekeeping Property, is not applicable, as it applies only to funds that an attorney possesses "in connection with a representation."

practice of law in Maryland." Consequently, we affirm the Trustees' decision that Mr. Grebow was not eligible to recover from the Fund.

### iv.       Substantial Evidence

Although the Trustees' "Final Decision" provides several reasons why Mr. Grebow's claim fails, we need only examine whether there was substantial evidence in the record to support their determination that Mr. Sniffen was not acting in a fiduciary capacity that was "traditional and customary in the practice of law in Maryland." Initially, we note that Mr. Grebow's "substantial evidence" argument, presented within his briefing on appeal, was waived as it was not raised in his question presented. *See O'Sullivan v. Kimmett*, 252 Md. App. 653, 678-79 (2021) ("Appellants can waive issues for appellate review by failing to mention them in their 'Question Presented' section of their brief." (quoting *Green v. N. Arundel Hosp. Ass'n., Inc.*, 126 Md. App. 394, 426 (1999))). In *Green v. North Arundel Hospital Ass'n*, this Court reasoned that "[c]onfining litigants to the issues set forth in the 'Questions Presented' segment of their brief ensures that the issues presented are obvious to all parties and the Court." 126 Md. App. at 426 (citing *DiPino v. Davis*, 354 Md. 18, 56 (1999)). Here, Mr. Grebow's question presented does not mention substantial evidence but, rather, challenges the Fund's determination under Maryland Rule 19-602(b) that Mr. Sniffen was not acting in the requisite fiduciary capacity.

Even if Mr. Grebow's claim was preserved, we hold that the Trustees' conclusion that Mr. Sniffen was not acting in a fiduciary capacity that was "traditional and customary in the practice of law in Maryland" was supported by substantial evidence. As the Court of Appeals has recently acknowledged, under the "substantial evidence test," we consider

28

whether the administrative agency's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mayor of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 667 (2021) (quoting *Bulluck v. Pelham Woods Apartments*, 283 Md. 505, 512 (1978)). As we have already explained above, the unusual terms[12] of the Escrow Agreement supply enough evidence for a reasoning mind to conclude that Mr. Sniffen was not acting in a qualifying fiduciary capacity under Maryland Rule 19-602.[13]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

[12] We agree with the Trustees that an agreement that provides for a fee of $2 million for the simple "parking" of just over $3 million for 16 months is unusual.

[13] Mr. Grebow also argues that the Fund's conclusion that he was involved in Mr. Sniffen's fraudulent scheme is "faulty" and "contrary to . . . publicly available findings by the Maryland state and federal courts[.]" While Mr. Grebow was awarded restitution by the Circuit Court for Baltimore County and the United States District Court for the District of Maryland, there is nothing in the record evincing that either court made findings of fact and adjudged Mr. Grebow a victim of Mr. Sniffen's theft scheme.